# UNITED STATES *v.* SANDOVAL.

# MORTON *v.* UNITED STATES.

### APPEALS FROM THE COURT OF PRIVATE LAND CLAIMS.

Nos. 205, 599.　Argued March 9, 10, 1897. — Decided May 24, 1897.

Under the laws of the Indies lands not actually allotted to settlers remained the property of the king, to be disposed of by him or by those on whom he might confer that power; and as, at the date of the Treaty of Guadalupe Hidalgo, neither the municipalities nor the settlers within them, whose rights are the subject of controversy in these suits, could have demanded the legal title of the former Government, the Court of Private Land Claims was not empowered to pass the title to either, but it is for the political department of the Government to deal with any equitable rights which may be involved.

*United States* v. *Santa Fé*, 165 U. S. 175, involved the same considerations in its disposition as those presented on this record, and its reasoning and conclusions are to be taken as decisive here.

THIS was a petition filed by Julian Sandoval and others in the Court of Private Land Claims for the confirmation under the act of March 3, 1891, c. 539, 26 Stat. 854, of what was known as the San Miguel del Bado grant in the Territory of New Mexico, containing 315,300 acres. It was alleged that the grant was made November 25, 1794, by Governor Chacon to Lorenzo Marquez for himself and in the name of fifty-one men accompanying him, and copies of the original application; of the decree of the governor thereon; of the report, November 26, 1794, of the alcalde Ortiz; and of the report of the alcalde Pino, in 1803, hereinafter set forth, were attached to the petition as exhibits.

Petitioners averred that Ortiz gave juridical possession of the grant to Marquez and his associates, and that they, soon after, "formed a settlement thereon, as required by the terms and conditions of the said grant, known as the town of San Miguel del Bado, on the present site of the town of that name, within the limits of the said grant, the said settlement being formed, as your petitioners are informed and believe, as a villa, with a corporation council, mayor, aldermen, attorney and secretary, and that the said settlement of San Miguel del Bado continued as a municipal corporation up to the time the Territory of New Mexico was ceded to the United States, the said town of San Miguel del Bado, embracing within its jurisdiction all of the land within the exterior boundaries of the said grant heretofore described, and the said grant, being, as your petitioners are informed and believe, given to the said settlement of San Miguel del Bado upon the condition that the said settlement should be formed and that the said tract should be in common not only to the petitioners, but to all other settlers who might join them in the future."

That the grant has since been occupied by the original settlers, their descendants and assigns, and others who have become part of that settlement, or moved upon the grant and formed other settlements within its exterior boundaries, or built isolated residences and settled thereon, and "has always been recognized as being a concession made to the town or settlement of San Miguel del Bado and all other settlers who

might join them in the future, and from thence hitherto as being the property of all the settlers within the exterior boundaries of the said grant, to be held and used by them in common, except as to such parts and portions as from time to time have been set apart in severalty to individual settlers thereon.

"That there is now no municipal corporation existing within the limits of the said grant of San Miguel del Bado, but all of the settlers upon the said grant, whether residing within the town of San Miguel del Bado or in other towns upon the said grant, or in isolated places thereon, as a community, have succeeded to all of the lands of the said grant, which have not, by prescription and by assignment of alcaldes under the original concession, and subsequent alcaldes, become the property of private individuals and held in severalty, and that the said community, embracing all of said settlers, have managed and controlled the lands of said grant by and through committees, appointed in popular assemblies held for that purpose, since their said municipal corporation, under the laws of Spain and Mexico, was abandoned. That the said individuals herein named as petitioners are the present duly authorized committee of the settlers on the said grant, and make this petition for and in behalf of themselves and all other settlers within the exterior boundaries of the said grant."

Certain proceedings were set forth as having been had on March 18, 1857, before the surveyor general of the Territory of New Mexico on a petition "made for and in the name of the inhabitants of the settlements of La Cuesta, San Miguel, Las Mulas, El Pueblo, Puerticita, San José, El Gusano and Bernal, the said settlements existing at the date thereof within the limits of the said grant and the inhabitants thereof comprising at that time all the settlers upon the said grant, the said petition reciting that the inhabitants of said settlements claimed said grant as being the legal heirs and successors of Lorenzo Marquez and fifty-one other persons, and that they had been up to that date in continual possession of the said grant"; also a report made to Congress on November 13, 1879, and a survey made of the tract, July 26, 1880, it

being stated that "no action has ever been taken by Congress in reference to the said San Miguel del Bado grant, either looking to its confirmation or rejection."

The prayer of the petition was as follows:

"Your petitioners, therefore, claim the said San Miguel del Bado grant as bounded, surveyed and described as hereinbefore set forth, and pray that the validity of their claim may be inquired into and decided by this court and that the said grant may be confirmed to your petitioners and all of the present settlers and residents upon the said grant, as being made to the town of San Miguel del Bado for the use and benefit of all of said settlers, and for the benefit of the owners in severalty of the lots and parcels of land within its limits."

The United States answered that the petition of Lorenzo Marquez of November, 1794, was not for, nor intended to be for, the exclusive use, benefit and behoof of said Lorenzo Marquez or any one else; that if Ortiz put Marquez and his co-petitioners in possession of the property, it was not intended that said "Marquez and his co-petitioners should have the exclusive possession of the whole of the property described in the boundaries set forth in his alleged petition, but that the same was for the use and benefit of said Marquez, his co-petitioners, and any and all citizens without lands who might thereafter settle upon the same; and further, that the entrances and exits, waters and pastures, and the use of the land unappropriated by individuals in severalty, should be common."

The answer further averred that the alcalde Pino was directed by Governor Chacon in March, 1803, to ascertain whether the terms of the grant had been complied with, and that he reported March 12 that he "found fifty-eight heads of families occupying the same; that in obedience to his said instructions he caused an amicable partition among them to be made, and assigned to each one the land he was so occupying and cultivating; that upon the return of said report the same was approved and confirmed by said Governor Chacon on the 30th day of March, 1803, to the resi-

dents of the new town of El Bado, known as San Miguel; that thereafter, up to the occupation of this country by the American troops in 1846, under the terms and conditions of said grant, various parties have moved upon the same, have occupied and cultivated it, and are holding and occupying, were and have been recognized ever since, until now there are a large number of settlements under said grant consisting of several thousand people, and upon which several towns have grown up under the form and construction given to the grant by Governor Chacon in 1803, and under the terms of the conditions of the pretended possession designated by the alcalde Ortiz in 1794, which in point of fact was never executed as alleged and claimed, but was given by Pino in 1803.

"That the names of the settlements are La Cuesta, San Miguel, Las Mulas, El Pueblo, Puerticita, San José, El Gusano and Bernal. The defendant is informed and charges the fact to be that all of these settlements and possessors were recognized by the Spanish Government, and were continued without interruption or challenge by the Mexican Government, and were in existence at the time the sovereignty of the United States was extended over it under the treaty of Guadalupe Hidalgo, and that no title ever passed, or was intended to pass, either legal or equitable, against the Spanish or Mexican Governments, except as to that portion which might be occupied and settled by said Marquez and his fifty-one co-petitioners, and those who might thereafter come in and settle and occupy the same; and that said claim is not entitled to confirmation for any more than was actually appropriated, occupied and cultivated in severalty prior to 1846; and it therefore says that this plaintiff, if entitled to confirmation of anything, is entitled to confirmation only of that portion which he actually occupied and possessed under said grant, and that all the portion of said land which had not been subjected in 1846 to actual occupancy and cultivation is, and of right ought to be, public domain."

After the commencement of Sandoval's suit, two others were instituted, one by Levi P. Morton and the other by Marquez and others, claiming that Lorenzo Marquez took

the title to the entire grant, as the other fifty-one were not named in the grant, petition or act of possession; and asking confirmation in their names alone as successors in interest to Lorenzo. These suits were consolidated with that of Sandoval and the three heard as one case.

The Court of Private Land Claims held that the act of partition of 1803 rendered the grantees certain, and dismissed the petitions of Morton and Marquez; and confirmed the grant in the name of Lorenzo Marquez and his co-grantees and all other persons who might have come in and settled on the grant up to December 30, 1848, Murray, J., dissenting. The United States and Morton appealed.

The papers referred to in Sandoval's petition, and constituting the expediente, were as follows:

" I, Lorenzo Marquez, resident of this town of Santa Fé, for myself and in the name of fifty-one men accompanying me, appear before your excellency, and state that in consideration of having a very large family, as well myself as those accompanying me, though we have some land in this town, it is not sufficient for our support, on account of its smallness and the great scarcity of water, which, owing to the great number of people, we cannot all enjoy, wherefore we have entered a tract of land on the Rio Pecos, vacant and unsettled, at the place commonly called El Vado, and where there is room enough not only for us, the fifty-one who ask it, but also for every one in the province not supplied. And its boundaries are, on the north the Rio de la Vaca, from the place called the Rancheria to the Agua Caliente; on the south the Cañon Blanco; on the east the Cuesta, with the little hills of Bernal, and on the west the place commonly called the Guzano, which tract we ask to be granted us in the name of our Sovereign, whom may God preserve; and among these fifty-one men petitioning are thirteen Indians, and among them all are twenty-five firearms, and they are the same persons who appear in the subjoined list which I present in due form; and we unanimously and harmoniously, as one person, do promise to enclose ourselves in a plaza well fortified with

·bulwarks and towers, and to exert ourselves to supply all the firearms and ammunition that it may be possible for us to procure. And, as we trust in a compliance with our peti- tion, we request and pray that your excellency be pleased to ·direct that we be placed in possession in the name of his Royal Majesty our Sovereign, whom may God preserve. And we declare in full legal form that we do not act with dissimu- lation, etc.

"LORENZO MARQUEZ,<br>
"<i>For Himself and the Petitioners.</i>"

[The list referred to does not appear.]

<i>"Decree.</i>

" At the town of Santa Fé, capital of this Kingdom of New Mexico, on the twenty-fifth day of the month of November, ·one thousand seven hundred and ninety-four, I, Lieutenant Colonel Fernando Chacon, knight of the order of Santiago, ·civil and military governor of said Kingdom, sub-inspector of the regular troops therein, and inspector of the militia thereof, for His Majesty (whom may God preserve), having seen the foregoing document and petition of Lorenzo Marquez for him- :self and in the name of fifty-one men, should and did direct the principal alcalde of this town, Antonio José Ortiz, to ·execute said grant as requested by the petitioners, so that they, their children and successors may have, hold and possess the same in the name of His Majesty, observing at the same time the conditions and requisites required in such cases to be observed, and especially that relative to not injur- ing third parties. Thus I ordered, provided and signed with the witnesses in my attendance, with whom I act for want of ·a royal or public notary, of which there is none in said king- dom, and upon this common paper, there being none of any :seal, to which I certify.

"CHACON.

" Attending : FERNANDO LAMELAS."

" On the twenty-sixth day of the month of November, one thousand seven hundred and ninety-four, I, Antonio José ·Ortiz, captain of the militia and principal alcalde of the town

of Santa Fé, in pursuance of the order of Lieutenant Colonel Fernando Chacon, knight of the order of Santiago, and civil and military governor of this Kingdom, before proceeding to the site of El Vado, I, said principal alcalde, in company with two witnessess, who were Xavier Ortiz and Domingo Santiestevan, the fifty-two petitioners being present, caused them to comprehend the petition they had made, and informed them that to receive the grant they would have to observe and fulfil in full form of law the following conditions:

"First. That the tract aforesaid has to be in common, not only in regard to themselves, but also to all the settlers who may join them in the future.

"Second. That with respect to the dangers of the place, they shall have to keep themselves equipped with firearms and bows and arrows, in which they shall be inspected as well at the time of settling as at any time the alcalde in office may deem proper, provided that after two years' settlement all the arms they have must be firearms, under the penalty that all who do not comply with this requirement shall be sent out of the settlement.

"Third. That the plaza they may construct shall be according as expressed in their petition; and in the meantime they shall reside in the pueblo of Pecos, where there are sufficient accommodations for the aforesaid fifty-two families.

"Fourth. That to the alcalde in office in said pueblo they shall set apart a small separate piece of these lands for him to cultivate for himself at his will, without their children or the successors making any objection thereto, and the same for his successor in office.

"Fifth. That the construction of their plaza, as well as the opening of acequies and all other work that may be deemed proper for the common welfare, shall be performed by the community with that union which in their government they must preserve.

"And when this was heard and understood by each and all of the aforesaid persons, they accordingly unanimously responded that they understood and heeded what was communicated to them.

"Wherefore I took them by the hand and announced in clear and intelligible words that in the name of His Majesty (God preserve him) and without prejudice to the royal interest or that of any third party, I led them over said lands, and they plucked up grass, cast stones, and shouted 'Long live the King,' taking possession of said land quietly and peaceably, without any objection, pointing out to them the boundaries, which are, on the north, the Rio de la Vaca, from the place called the Rancheria to the Agua Caliente; on the south, the Cañon Blanco; on the east, the Cuesta with the little hills of Bernal, and on the west, the place commonly called the Guzano, notifying them that the pastures and watering places are in common. And that in all time it may so appear, I, acting by appointment, for want of a notary, there being none in this jurisdiction, signed this with my attending witnesses, with whom I act. To which I certify.

"ANTONIO JOSÉ ORTIZ.

"Attending: JOSÉ CAMPO REDONDO.
"ANT'O JOSÉ ORTIZ.


"This copy agrees with its original on file among the archives of this town, and is faithfully and legally made, compared and corrected. In testimony whereof I make my customary sign manual, in this town of Santa Fé, on the eighth day of the month of November, one thousand seven hundred and ninety-four.

"(Signed)                    ANTONIO JOSÉ ORTIZ."


"[SEAL.]                                        Fourth rial.
"Fourth seal, fourth rial, years one thousand seven hundred and ninety-eight and ninety-nine.

"[SEAL.]

"At this place, San Miguel del Bado del Rio de Pecos, jurisdiction of the capital town of Santa Fé, New Mexico, on the twelfth day of March in the present year, one thousand eight hundred and three, I, Pedro Baptista Pino, justice of second vote of the town of Santa Fé and its jurisdiction, by verbal order of Colonel Fernando Chacon, governor of this

province, have proceeded to this said settlement for the purpose of distributing the lands which are under cultivation to all the individuals who occupy said settlement; and having examined the aforesaid cultivated land, I measured the whole of it from north to south and then proceeded to lay off and provide the several portions, with the concurrence of all parties interested, until the matter was placed in order according to the means myself and the parties interested deemed the best adapted to the purpose, in order that all should be satisfied with their possessions, although said land is very much broken on account of the many bends in the river. And after the portions were equally divided in the best manner possible I caused them to draw lots, and each individual drew his portion, and the number of varas contained in each one portion was set down, as will appear from the accompanying list, which contains the number of the individuals who reside in this precinct, amounting to the number of fifty-eight families, between whom all the land was divided, excepting only the portion appertaining to the justice of this precinct, as appears by the possession given by the said governor, and another small surplus portion, which by the consent of all is set aside for the benefit of the blessed souls in purgatory, on condition that the products are to be applied annually to the payment of three masses, the certificates for which are to be delivered to the alcalde in office of said jurisdiction. And after having made the distribution, I proceeded to mark out the boundaries of said tract from north to south, being on the north a hill situated at the edge of the river above the mouth of the ditch which irrigates said lands, and on the south the point of the hill of pueblo and the valley called Temporales, a large portion of land remaining to the south, which is very necessary for the inhabitants of this town who may require more land to cultivate, which shall be done by the consent of the justice of said town who is charged with the care and trust of this matter, giving to each one of those contained in the list the amount he may require and can cultivate; and after having completed all the foregoing, I caused them all to be collected together and notified them that they

must each immediately erect mounds of stone on the boundaries of their lands so as to avoid disputes, and I also notified them that no one was privileged to sell or dispose of their land until the expiration of ten years from this date, as directed by said governor, who, if he be so pleased, will certify his proper approval at the foot of this document, of which a copy shall remain in this town and the original be deposited in the archives where it properly belongs. Done in the aforesaid town, on the day, month and year above mentioned; signed with my hand with two attending witnesses, with whom I act in the absence of a public or royal notary, there being none of any description in this kingdom. I certify.

"(Signed)                  PEDRO BAPTISTA PINO.
"Attending: JOSÉ MIGUEL TAFOYA."

Here followed the list of fifty-eight individuals, with the number of varas each one received, running from 49 varas in one instance to 230 in another, 65 varas being allotted in thirty-eight instances.

"There are contained in this list fifty-eight families.

"San Miguel del Bado, March twelfth, one thousand eight hundred and three.                  PEDRO BAPTA. PINO.

"Given gratis, together with twenty-odd leagues travel.
["PINO's RUBRIC.]

"By virtue of what has been done by Pedro Pino, senior justice of second vote of this capital town of Santa Fé concerning the distribution of lands made in the name of His Majesty to the residents of the new town of El Bado, known as San Miguel, I declare the aforesaid residents of El Bado the lawful owners thereof, approving and confirming the possession given by said Senior Justice Pedro Pino; and in order that it may so appear in all time, I signed this at Santa Fé, New Mexico, on the 30th day of March, 1803.

"FERNANDO CHACON."

It appeared in evidence that the alcalde, Pino, two days after making the distribution at San Miguel, made another

at the place of San José, within the same grant, which was approved by Governor Chacon, March 30, 1803, the same day that he approved the allotment of land at San Miguel; that allotments were made from time to time within this grant at various other places until at least 1846; that a town was formed known as the town of San Miguel del Bado, an ayuntamiento or town council being elected, and also an alcalde; that the town continued until the American occupation; that jurisdiction was exercised by the town council, not only over the municipality and those living therein, but over the adjoining country and settlements which were too small to be entitled to an ayuntamiento; and that at present there are living within the outboundaries of the grant at least four or five thousand people who have collected themselves principally within four or five settlements.   Testimony was further introduced, disclosing the manner in which the lands included within the outboundaries had been administered, and also the administration of property rights in adjoining settlements. This tended to show that the people cultivated the portions of land that were partitioned to them according to the number in the family; that they obtained the land from the ayuntamiento, but the alcalde was the person who, under the direction of the board, made the partition to those who came in from time to time to settle, from lands which had not been partitioned before; that the unassigned lands were common pasture grounds for everybody, and the water and watering places were free to all and for the benefit of all families; but none of them were considered the owners of the common pasture grounds, and they had no right to sell anything except the tracts upon which they had houses and farms.

In brief, the evidence is correctly summed up by counsel for the United States as showing that subsequent to the allotment and partition of 1803, and up to the date of the American occupation, the lands within the boundaries of this grant and a large amount of outlying lands were administered by the government of New Mexico through the ayuntamiento of San Miguel del Bado; that persons coming subsequent to

the allotment of 1803 applied to the ayuntamiento for land, and if the petition or application were favorably received and considered, the alcalde was instructed to make them allotments of land for agricultural purposes and to put them into possession of the same, but always subject to the territorial deputation.

*Mr. Matthew G. Reynolds* for the United States.  *Mr. Solicitor General* was on his brief.

*Mr. T. B. Catron* for Morton.  *Mr. Edward L. Bartlett* filed a brief for same.

*Mr. John D. W. Veeder* for Sandoval *et al.*

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

By Article VIII of the treaty of Guadalupe Hidalgo of February 2, 1848 (and we are not concerned here with the treaty of December 30, 1853), Mexicans established in territories previously belonging to Mexico, and remaining for the future within the limits of the United States as defined by the treaty, were free to continue where they then resided, or to remove at any time to Mexico, " retaining the property which they possessed in said territories or disposing thereof or removing the proceeds wherever they please," and " in the said territories property of every kind now belonging to Mexicans not established there shall be inviolably respected.  The present owners, the heirs of these, and all Mexicans who may acquire said property by contract, shall enjoy, with respect to it, guarantees equally ample as if the same belonged to citizens of the United States."   9 Stat. 922, 929.

The mode in which private rights of property may be secured, and the obligations imposed upon the United States, by treaties, fulfilled, belongs to the political department of the government to provide.   In respect to California, this was done through the establishment of a judicial tribunal, but in

respect of the adjustment and confirmation of claims under grants from the Mexican government in New Mexico and in Arizona, Congress reserved to itself, prior to the passage of the act of March 3, 1891, creating the Court of Private Land Claims, the determination of such claims. *Astiazaran* v. *Santa Rita Mining Company*, 148 U. S. 80; *Ainsa* v. *United States*, 161 U. S. 208, 222.

By the act of March 3, 1851, c. 41, 9 Stat. 631, Congress created a board of land commissioners to determine claims to land in California asserted "by virtue of any right, or title, derived from the Spanish or Mexican government." § 8.

Section 11 of the act provided that the board of commissioners thereby created, the District Court and this court, "in deciding on the validity of any claim brought before them under the provisions of this act, shall be governed by the treaty of Guadalupe Hidalgo, the law of nations, the laws, usages and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of United States, so far as they are applicable"; that is, the decisions theretofore given in relation to titles in Louisiana and Florida, which were derived from the French or Spanish authorities previous to the cession to the United States. *Fremont* v. *United States*, 17 How. 542, 553.

Section 14 permitted the claims of lot holders in a city, town or village to be presented in the name thereof, and authorized the presumption of a grant to such city, town or village when shown to have been in existence on the day named.

The act of March 3, 1891, is couched in different phraseology.

Section 6 authorizes any person or persons, or corporation or their legal representatives, claiming lands within the limits of the territory derived by the United States from the Republic of Mexico, "by virtue of any such Spanish or Mexican grant, concession, warrant or survey as the United States are bound to recognize and confirm by virtue of the treaties of cession of said country by Mexico to the United States which at the date of the passage of this act have not been confirmed

by act of Congress, or otherwise finally decided upon by lawful authority, and which are not already complete and perfect," to file a petition in the Court of Private Land Claims praying that "the validity of such title or claim may be inquired into and decided."

By section 7 it is provided that the proceedings should "be conducted as near as may be according to the practice of the courts of equity of the United States," and the court is empowered "to settle and determine the question of the validity of the title and the boundaries of the grant or claim presented for adjudication, according to the law of nations, the stipulations of the treaty concluded between the United States and the Republic of Mexico at the city of Guadalupe Hidalgo, on the second day of February, in the year of our Lord, eighteen hundred and forty-eight, or the treaty concluded between the same powers at the City of Mexico, on the thirtieth day of December, in the year of our Lord, eighteen hundred and fifty-three, and the laws and ordinances of the government from which it is alleged to have been derived."

Section 13 provides that all the proceedings and rights thereinbefore referred to shall be conducted and decided subject to certain enumerated provisions and to the other provisions of the act.

Among the provisions contained in section 13 is the following:

"First. No claim shall be allowed that shall not appear to be upon a title lawfully and regularly derived from the government of Spain or Mexico, or from any of the States of the Republic of Mexico having lawful authority to make grants of land, and one that if not then complete and perfect at the date of the acquisition of the territory by the United States, the claimant would have had a lawful right to make perfect had the territory not been acquired by the United States, and that the United States are bound, upon the principles of public law, or by the provisions of the treaty of cession, to respect and permit to become complete and perfect if the same was not at said date already complete and perfect."

The seventh subdivision of the same section reads thus:

." No confirmation in respect of any claims or lands mentioned in section six of this act or in respect of any claim or title that was not complete and perfect at the time of the transfer of sovereignty to the United States as referred to in this act, shall in any case be made or patent issued for a greater quantity than eleven square leagues of land to or in the right of any one original grantee or claimant, or in the right of any one original grant to two or more persons jointly, nor for a greater quantity than was authorized by the respective laws of Spain or Mexico applicable to the claim."

But this limitation does not, in our judgment, affect the construction of the act so far as brought in question in the case in hand.

In *Ainsa* v. *United States*, 161 U. S. 208, 223, attention was called to the act of March 3, 1851, and it was said: " But, under the act of March 3, 1891, it must appear, in order to the confirmation of a grant by the Court of Private Land Claims, not only that the title was lawfully and regularly derived, but that, if the grant were not complete and perfect, the claimant could, by right and not by grace, have demanded that it should be made perfect by the former government, had the territory not been acquired by the United States."

This was reaffirmed in *United States* v. *Santa Fé,* 165 U. S. 675, 714, and Mr. Justice White, speaking for the court, said : " An inchoate claim, which could not have been asserted as an absolute right against the government of either Spain or Mexico, and which was subject to the uncontrolled discretion of Congress, is clearly not within the purview of the act of March 3, 1891, c. 539, creating the Court of Private Land Claims, 26 Stat. 854, and, therefore, is beyond the reach of judicial cognizance. The duty of protecting imperfect rights of property under treaties such as those by which territory was ceded by Mexico to the United States in 1848 and 1853, in existence at the time of such cessions, rests upon the political and not the judicial department of the government. *Le Bois* v. *Bramell,* 4 How. 449, 461 ; *Ainsa* v. *United States,* 161 U. S. 208, 222. To the extent only that Congress has vested them with authority to determine and protect such

rights, can courts exercise jurisdiction. Where, therefore, a tribunal of limited jurisdiction is created by Congress to determine such rights of property, a party seeking relief must present for adjudication a case clearly within the act, or relief cannot be given. *United States* v. *Clarke*, 8 Pet. 436, 444."

And after referring to sections 13 and 7, and pointing out that "the meaning of the words 'complete and perfect,'" as used in section 6, "is to be derived by considering the context and not by segregating them from the previous part of the sentence exacting that the claim must be one which the United States was bound to recognize and confirm by virtue of the treaty"; and that "these words are moreover controlled by the mandatory requirements of section 13," the opinion thus continues: "Although the act of 1891, in section 11, authorized a town presenting a claim for a grant to represent the claims of lot holders to lots within the town, this provision does not override the general requirements of the statute as to the nature of the claim to title which the court is authorized to confirm. The difference between the act of 1891 and the California act of 1851, hitherto referred to, accentuates the intention of Congress to confine the authority conferred by the later act to narrower limits than those fixed by the act of 1851. The act of 1851 authorized the adjudication of claims to land by virtue of any 'right' or 'title' derived from the Spanish government, and conferred the power in express language on the board and court to *presume a grant in favor of a town.* The act of 1891 not only entirely omits authority to invoke this presumption, but, as we have seen, excludes by express terms any claim, the completion of which depended upon the mere grace or favor of the government of Spain or Mexico, and of the United States as the successor to the rights of these governments."

The contention on behalf of the United States is that the Court of Private Land Claims had no power to confirm lands situated as these were, within the outboundaries, that had not been allotted prior to the date of the treaty because under the laws of Spain and Mexico the *jus disponendi* of all unassigned

lands remained in the government and passed to the United States.

The papers in the expediente show that it was the intention that a town or pueblo should be, and that it was, established. The application stated that the land asked for was intended not only for the fifty-one petitioners, "but also every one in the province not supplied"; the alcalde Ortiz was directed to execute the grant on "the conditions and requisites required in such cases to be observed"; the conditions are set out by the alcalde in his report as all agreed to by petitioners, among them being the provision that the tract was to "be in common, not only in regard to themselves, but also to all the settlers who may join them in the future."

In 1803, the alcalde Pino under instructions from the governor went upon the grant and divided the lands which had been occupied and cultivated amongst the original petitioners and some others, and put each one in the possession of the lot drawn by him, notifying them that no one should have the right to sell the land allotted to him until the expiration of ten years from that date as directed by the governor. The grant purported to convey only the use of the lands with the right to acquire the legal title to such portion of it as might be allotted to each in severalty on condition that they remained on it and cultivated it for ten years, while the unoccupied or common lands were declared to be for the benefit of the original grantees and all other persons who might desire to settle on the grant and who complied with the terms in regard to settlement and cultivation.

Did the fee to lands embraced within the limits of the pueblo and intended for community use continue to remain in the sovereign or did it pass to the pueblo?

The general subject was much considered in *United States* v. *Santa Fé, supra,* and it was said: "It cannot be doubted that under the law of Spain it was necessary that the proper authorities should particularly designate the land to be acquired by towns or pueblos before a vested right or title to the use thereof could arise." Various extracts were made from the laws of the Indies, and the fol-

lowing passages from Elizondo's Practica Universal Forense were quoted:

"The Kings, the fountains of jurisdictions, are the owners of all the *terminos* situated in their kingdoms, and as such can donate them, divide or restrict them, or give any new form to the enjoyment thereof, and hence it is that the pueblos cannot alienate their *terminos* and *pastos* without precedent royal license and authority." Vol. 3, p. 109. "There is nothing whatever designated by law as belonging to towns, other than that which by royal privilege, custom or contract between man and man, is granted to them, so that although there be assigned to the towns at the time of their constitution a *territorio* and *pertinencias*, which may be common to all the residents, without each one having the right to use them separately, it is a prerogative reserved to the princes to divide the *terminos* of the provinces and towns, assigning to these the use and enjoyment, but the domain remaining in the sovereigns themselves." Vol. 5, p. 226.

And it was then observed: "Moreover, the general theory of the Spanish law on the subject indicates that, even after a formal designation, the control of the outlying lands, to which a town might have been considered entitled, was in the King, as the source and fountain of title, and could be disposed of at will by him or by his duly authorized representative, as long as such lands were not affected by individual and private rights. This is shown by the quotation from Elizondo, already made. The provisions of law 14, title 12, book 4, of the Recopilacion (2 White, New Recop. p. 52), . . . illustrate the absolute control thus exercised by the King of Spain over the subject."

The existence of this power of control and disposition as to municipal lands in the supreme Spanish and then Mexican authority was shown by further references, and various acts of Congress were cited as enacted in view "of this state of the Spanish law and the unquestioned power lodged in the King of Spain to exercise unlimited authority over the lands assigned to a town and undisposed of and not the subject of private grant, to all of which rights the United States suc-

ceeded as successor of the King of Spain and the government of Mexico."

" So, also," said the court, " it may well be supposed that it was upon this aspect of the imperfect nature of right in land claimed by towns in territory formerly owned by Spain and Mexico, and the long established construction of such rights evidenced by the foregoing acts of Congress, which caused this court, speaking through Mr. Justice Field, in *Grisar* v. *McDowell,* 6 Wall. 363, 373, to say : 'Even after the assignment the interest acquired by the pueblo was far from being an indefeasible estate such as is known to our laws.  The purposes to be accomplished by the creation of pueblos did not require their possession of the fee.  The interest . . . amounted to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands or as a source of revenue, or for other public purposes.  And this limited right of disposition and use was in all particulars subject to the control of the government of the country.' "

Although the particular question arising in the foregoing case was whether the Spanish law, *proprio vigore,* conferred upon every Spanish villa or town a grant of four square leagues of land, yet its disposition involved the same considerations as those presented on this record, and we regard its reasoning and conclusions as decisive here.

Under the laws of the Indies, lands not actually allotted to settlers remained the property of the King, to be disposed of by him or by those on whom he might confer that power. As Mr. Hall says (chap. VII, § 122): "The fee of the lands embraced within the limits of pueblos continued to remain in the sovereign, and never in the pueblo as a corporate body." Subsequent decrees, orders and laws did not change the principle.

Towns were established in two ways: By their formation by empresarios or contractors, the title to the lands granted vesting in the contractors and settlers, minute provisions being made in relation thereto: By individuals associating themselves

together for that purpose and applying to the governor of the province, through whose action a city, villa or place was established. These municipalities appear to have been *quasi* corporations, corporations *sub modo*, and their ayuntamientos exercised political control over the pueblos and over surrounding country attached to their jurisdiction. The alcalde made allotments subject to the orders of the ayuntamiento, and they again were apparently subject to the provincial deputation or an equivalent superior body. At all events, unallotted lands were subject to the disposition of the government.

At the date of the treaty of Guadalupe Hidalgo, neither these settlers nor this town could have demanded the legal title to such lands of the former government, and the Court of Private Land Claims was not empowered to pass the title to either. It is for the political department to deal with the equitable rights involved.

*The result is that the decree in* Morton *v.* United States *is affirmed, and the decree in* United States *v.* Sandoval *and others is reversed, and the cause remanded that a decree may be entered in conformity with this opinion; and it is so ordered accordingly.*