ALEXANDER et al. v. GARCIA et al.
(No. 5305.)

(Court of Civil Appeals of Texas. San Antonio. June 17, 1914. On Motion for Rehearing, July 2, 1914.)

1. EVIDENCE (§ 11*)—JUDICIAL NOTICE—GEOGRAPHICAL FACTS.

Judicial notice will be taken that Palafox was established as a town by the Spanish government.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 15, 16; Dec. Dig. § 11.*]

2. APPEAL AND ERROR (§ 1051*)—HARMLESS ERROR—EVIDENCE.

Where there was enough proper evidence to establish a fact, the admission of illegal evidence was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. § 1051.*]

3. ADVERSE POSSESSION (§ 7*)—MUNICIPAL CORPORATIONS (§ 51*)—PROPERTY SUBJECT TO PRESCRIPTION—PUBLIC LANDS.

In 1810 the Spanish government established the town of Palafox, granting to it four leagues of land. In 1818, the town was completely destroyed by Indians, and most of the inhabitants killed, and remainder abandoned the town, and for more than 65 years there was a complete abandonment of the town. More than 50 years after such abandonment defendants "squatted" on the land. Held, that upon abandonment of the town all parts of the grant not having been conveyed by the town to individuals reverted to the Spanish government, and hence passed and became a part of the public domain of the state of Texas by the treaty of Guadalupe Hidalgo, and, being such, defendants could not acquire title to any part thereof by limitations.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7;* Municipal Corporations, Cent. Dig. §§ 138–140; Dec. Dig. § 51.*]

On Motion for Rehearing.

4. APPEAL AND ERROR (§ 832*)—REHEARING—GROUNDS.

A motion for rehearing, which made no complaint of the opinion on the merits of the case, the only complaint being the refusal to dismiss the case because appellant's briefs had not been properly filed, was overruled; it not appearing that appellees were prejudiced in any way.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3215–3228; Dec. Dig. § 832.*]

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Action by George R. Alexander and others against Agustin G. Garcia and others. Judgment for defendants, and plaintiffs appeal. Reversed and rendered. Rehearing denied.

See, also, 167 S. W. 1102.

A. Winslow, of Laredo, and N. A. Rector, of Austin, for appellants.

FLY, C. J. This is a suit instituted by George R. Alexander, Mrs. Andrea J. de Alexander, Higinio Cantu, and J. D. Randolph, to recover four 640-acre tracts of land from Agustin G. Garcia and 18 others, appellees herein. The cause was tried by jury; but, after they had been charged and considered

the case for some time, the court instructed a verdict for appellees, which was returned and forms the basis for the judgment from which this appeal has been perfected.

Appellants bought the lands in controversy from the state of Texas, said lands being a portion of the public domain. Appellees were mere trespassers and squatters on the land.

[1, 2] Most of the assignments relate to the introduction of evidence, documentary and parol, to prove the establishment of the town of Palafox, by the Spanish government, in 1810, and a grant to it of four leagues of land on the Rio Grande. It becomes unnecessary to consider the assignments, for the reason that the Supreme Court, in Railway v. Jarvis, 80 Tex. 456, 15 S. W. 1089, has held that it was judicially known to that court, in 1891, that Palafox was established as a town, and, if judicially known then to that court, it is judicially known now to this court. There was enough proper testimony introduced to indicate the grant of the four leagues of land to the town of Palafox, and any evidence bearing on the subject that may have been illegal could not have injuriously affected appellants.

[3] The evidence showed, also, that the town of Palafox was completely destroyed by Indians in 1818, and most of the inhabitants were killed and the remainder abandoned the town, and that there was no effort to again settle the town until 1884. For more than 65 years there was a complete abandonment of the town, during which period the land was under the flags of Spain, Mexico, and the United States. There was clearly an abandonment of the land, and the purposes for which it was granted ceased to exist, and the question arises: To whom then did the lands belong that had not been conveyed to individuals? Would they lie there unclaimed and unused through generation after generation of men, the home of the coyote and the rattlesnake, and the fiction prevail that a town was located there among the cacti and the mesquite, and that it was the property of that imaginary town? Was it no-man's land where the trespasser and the squatter might find an abiding place and successfully resist eviction by the claim that over 100 years ago the King of Spain had granted the land to a town? There can be no doubt that a negative answer is the only reasonable one to these questions, and that, when there was an abandonment for so long a time as to evidence its permanency, the sovereign who had never parted with the fee to it would resume control and dominion over it. It had been granted for a purpose and on certain conditions. The purpose had failed, the conditions were unfulfilled, and the lands passed back into the public domain, to be disposed of as the overlord of the soil might feel disposed. The authorites sustain this proposition. Dittmar v. Dignowitty, 78 Tex. 22, 14 S. W. 268; State v. Gallardo (Sup.) 166 S. W.

369; Bond v. Barela, 229 U. S. 488, 33 Sup. Ct. 809, 57 L. Ed. 1292. This will appear by a review of those cases and others.

In the case of Dittmar v. Dignowitty it was held, after discussing a grant to the city of San Antonio:

"It does not follow from this, however, that title to the lands embraced within the city limits so vested in the city as a corporation as to deprive the Spanish government of power to confer title to parts of it on individuals. We know that house lots and lands for cultivation were granted in cities so established to inhabitants, and that these became their private property. Other lands within such cities were appropriated for ejidos, and for pasture and other purposes, and these were for the use and benefit of the inhabitants generally; but it is not believed that the absolute ownership of lands in such cities or towns ever vested in them as corporations so long as Spanish dominion continued over the country. Lands in cities and towns granted to individuals became their private property; and places essentially public, such as plazas, may have been inalienable, and thus the title to them in a sense vested in the city or its inhabitants. We, however, know of no law which vested in a city or town title in fee to the lands within its limits, or deprived the Spanish government of power to sell or dispose of lands therein not given or sold to individuals or dedicated to some use essentially public."

In that case there had been no destruction and abandonment of the town, and the court very properly restricted the right of the government to alienate any of the property granted to the city to those parts not sold to individuals or set apart to purposes essentially public, such as plazas. We think, however, that, when the whole of the land has been permanently abandoned, all parts of the grant not conveyed to individuals revert to the crown or state, and are subject to sale to actual settlers. After more than half a century of such abandonment, trespassers and "squatters," who at no time ever had any interest in the lands, either as plazas, streets, or commons, can revive the ancient grant and gain for themselves privileges as settlers that were granted by Spain more than 100 years ago. That grant, by abandonment and nonuse, had been destroyed and the claim had by town and inhabitants through the grant forever obliterated. Texas succeeded to all the rights of sovereignty held by Spain and Mexico over the land.

In the case of Bond v. Barela, it was held that all of the land alloted to a town under the Spanish government remained in the government and passed to this government upon its acquisition of the territory, unless the same had been granted to settlers thereon. That case followed the case of United States v. Sandoval, 167 U. S. 278, 17 Sup. Ct. 868, 42 L. Ed. 168, wherein the following language of Mr. Justice Field in Grisar v. McDowell, 73 U. S. (6 Wall.) 363, 18 L. Ed. 863, was indorsed:

"Even after the assignment the interest acquired by the pueblo was far from being an indefeasible estate such as is known to our laws. The purposes to be accomplished by the creation of pueblos did not require their possession of

the fee. The interest * * * amounted to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands, or as a source of revenue, or for other public purposes. And this limited right of disposition and use was in all particulars subject to the control of the government of the country."

Under that ruling all of the land contained in the town of Palafox became the property of Texas after its conquest by the American forces and the signing of the treaty of Guadalupe Hidalgo, except any such portions as had been granted to settlers thereon. Whatever control the town may have had was lost by its disorganization and destruction in 1818. It follows that the only title that any one could assert to any of the land as against the state, or any one claiming under it, must be deraigned from the settlers to whom any part of it may have been granted.

In the case of Townsend v. Greeley, 72 U. S. (5 Wall.) 326, 18 L. Ed. 547, the question of the rights of towns or pueblos to the lands granted to them is discussed by Justice Field, who was noted for his thorough acquaintance with Spanish land law, and the same views expressed as in the Grisar v. McDowell Case, and it was further held that the treaty of Guadalupe Hidalgo protected whatever rights towns may have had in lands just as it did those of individuals, but if there was no town at the time of the making of the treaty there were no rights to be protected by it, and the land became a part of the public domain of Texas. The land was given to the town in trust for its inhabitants, and when it abandoned the trust, and no successor took its place, the land reverted to the government and became a part of the public domain.

The creating of Spanish towns and the endowing of them with large grants of land came into being as the progeny of eight centuries of warfare with the Moors. The expulsion by degrees of the invaders was a long and tedious task, and the town grants were made and men encouraged to settle on them in order to form outposts and barriers against reacquisition of the territory by the enemy. When America was discovered, the same system was inaugurated by the Spaniards for the same purpose in all parts of this continent acquired by them, and so it is that in every grant to a town military service was exacted as well as the payment of taxes. Long lines of these Spanish towns extended across Texas and along its rivers, forming the vanguard of Spanish civilization in the conquest of the country from the Indians. Whenever one of those outposts was permanently abandoned, the reason for the grant no longer existed, and, where no private rights had intervened, the crown resumed its dominion over it. In this instance the outpost was destroyed by the Indians, and no effort was ever made to rebuild it or resettle it while under Spanish or Mexican dominion, and its corporate existence has never been revived under American rule. Under the treaty of Guadalupe Hidalgo, there were no rights to be respected except those of any individual settler in the town. There was no town and the grant had lapsed 30 years before American dominion over the land had been established. The land became a part of the public domain of Texas, under the articles of agreement by which the Republic was dissolved and became a member of the American Union, and in order to weaken or destroy its claim upon the land forming the old grant to Palafox it becomes necessary, as hereinbefore stated, for any claimant to deraign title from one who obtained a grant as a settler on the town lands. He must show a grant by the ayuntamiento or city council, or other competent authority, to some one from whom he is claiming to have obtained title by conveyance or inheritance. He could not obtain title by limitation as against any portion of the land belonging to the state, and of course pleas of limitation would be utterly futile and unnecessary.

Neither of the appellees connected himself with any grant that may have been made to settlers, nor was it shown that the land sold by the state to appellants was in conflict with any such grant; but the case seems to have been tried alone upon the theory that the land having been granted in 1810 to the town of Palafox was forever separated from the public domain, was titled property, and could not be sold by the state. That issue being determined against appellees, they have no standing in this court.

The judgment is reversed, and judgment here rendered that appellants recover of appellees the land described in the pleadings.

### On Motion for Rehearing.

[4] This cause was filed in this court on March 31, 1914, and was set down for submission on May 27th. At the time that appellants were notified that the cause was to be submitted, no brief had been filed for the reason that appellees had agreed that it should not be filed before July 1st. As soon as they were notified of the submission, appellants prepared a brief and filed the same in this court on May 16th and on same date served appellees with a printed copy thereof. Appellees, although this was 11 days before the day of submission, made no effort to file a brief and did not request time of this court in which to complete a brief, but sought to dismiss the cause because the briefs had not been filed in the district court and earlier filed in this court. On June 3, 1914, this court refused to strike out the briefs of appellant, and gave its reasons for such refusal in a written opinion herein filed. On June 30th, 27 days after this court refused to strike out the briefs, appellees filed this motion for rehearing. No complaint is made of the opinion on the merits of the case, nor is it claimed that appellees were in any manner damaged by the judgment herein rendered on

the merits. The whole attack is made on the order overruling the motion to dismiss and that filed more than 15 days after the judgment denying a dismissal was entered. Appellees had an abundance of time in which to file a brief both before and after submission, but failed and refused to do so, and it was indicated to them in our first opinion that time in which to prepare briefs would be granted if appellees desired it. They did not desire it, but preferred to risk their case on a motion to dismiss. They do not attack the opinion on the merits, and it must be presumed that they are satisfied therewith.

The motion for rehearing is overruled.