## REILLY v. SHIPMAN et al.

(Circuit Court of Appeals, Eighth Circuit. May 11, 1920.)

No. 5416.

1. **Public lands** ☞205—**Mexican grant to community and not to individuals.**
A Mexican grant of land in 1822 on what is now New Mexico, known as the Anton Chico grant, as confirmed by Act June 21, 1860, *held* not a grant to individuals, but a community grant to the inhabitants of the town of Anton Chico.

2. **Public lands** ☞211—**Act confirming Mexican grant conclusive as to nature of title.**
Where a Mexican grant of lands in territory now belonging to the United States has been directly confirmed by act of Congress, such action is conclusive, and any controversy as to the nature of the title must be determined from the confirmatory act, back of which the courts cannot go.

In Error to the District Court of the United States for the District of New Mexico; Colin Neblett, Judge.

Ejectment by Hugh Reilly against Robert Shipman and others, doing business as Shipman & Thompson. Trial to court, and judgment for defendants, from which plaintiff brings error. Affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

F. Faircloth, of Santa Rosa, N. M., for plaintiff in error.

S. B. Davis, Jr., of East Las Vegas, N. M., and E. R. Wright, of Santa Fé, N. M., for defendants in error.

Before CARLAND and STONE, Circuit Judges, and ELLIOTT, District Judge.

STONE, Circuit Judge. Error by plaintiff below from adverse judgment in a suit for ejectment and damages for a tract of land containing over 378,000 acres, situated in the counties of Guadalupe and San Miguel, state of New Mexico, and known as the Anton Chico grant.

The contentions of the plaintiff are that the original grant from the Mexican government in 1822 was to the grantees as individuals; that the patent issued in 1883 in conformity with the confirming act of Congress of June 21, 1860 (12 Stat. 71), was to the original grantees as individuals, and inured to their successors in title; that his title deraigns directly from such grantees; that he or his predecessors in title have been in adverse possession claiming title for more than 10 years. The contentions of the defendants are that the original grant was not to individuals as such, but to a community or town; that the confirming act of 1860 was to the inhabitants of Anton Chico as a community; that the patent is to the patentees as a community, but, if not, it is a nullity, as the act must control; that plaintiff's title is not deraigned from the original grantees; that there has been no sufficient adverse possession; that plaintiff is estopped and barred from claiming title by an adjudication of this title in the state courts.

A jury being waived, the court, besides refusing various findings of fact (including adverse possession) requested by plaintiff, found that the grant was not to individuals as such, but to a community, and that the suit in the state court operated as an estoppel or bar to plaintiff in this action.

[1] The first matter to be considered is the character of title, whether individual or community, of the original grant, as well as the effect thereon of the subsequent confirmatory act of 1860, and the patent issued thereon in 1883. The history of the title up to and including the act, with an outline of the patent, are as follows:

January 24, 1822, Salvador Tapia, for himself and 17 others named therein, petitioned the "president and respective tribunal" of independence for a "tract of land on this river called Anton Chico." For want of jurisdiction, this petition was referred to the governor. May 2, 1822, Fecundo Melgares, the governor, ordered Manuel Baca, constitutional justice of the jurisdiction of San Miguel del Bado, which adjoined this land, to place the parties in possession. This order recites that it is made after "having seen the present document and the petition of Citizen Manuel Rivera, for himself and in the name of 36 men." No such petition by Rivera is preserved, and Rivera was not one of those joining in the Tapia petition. The direction of the order was:

"To place the parties in possession of the grant they ask for, in order that they, their children, heirs, and successors, may hold and possess them in the name of his majesty, observing in so doing all the circumstances and requirements which should be practiced in similar cases, and particularly the one citing injury."

The action of Baca is shown by his report filed May 2, 1822, as follows:

"I, Manuel Baca, constitutional justice and commander in arms, in compliance with the directions of Governor Don Fecundo Melgares, gentleman of the order of San Ermerigildo, political and military governor of this kingdom, before proceeding to the Sangre de Cristo vulgarly called Anton Chico, in the presence of two aldermen, who were Don Ventura Trujillo, 2d alderman, and Don Miguel Sisneros, 3d alderman, the 36 petitioners being present, I read the petition to them and gave them to understand that they were to comply with and perform according to law the following conditions:

"First. That the place selected should be common, not only for themselves, but also for all those citizens who in the future should remove to and settle there.

"Second. That concerning the arrangements of the place they shall be equipped with firearms and arrows, and they shall pass muster upon entering upon the land and whenever the justice sent to them shall deem proper.

"Third. That the labor of the town, such as the digging of ditches, and many other works as may be necessary to be performed for the common good, shall be performed by all and other [torn] charge each one for himself.

"In regard to their compliance with the foregoing conditions they unanimously answered that they understood them and were acquainted with the conditions I had imposed upon them, in consequence of which I took them by the hand and stated in a clear, intelligible voice that in the name of our independence, which may God preserve, without injury to its royal credit nor the ——

"Fourth. I walked with them over the lands, they pulled up grass, throwing stones, and crying aloud saying, 'Long life to the independence,' taking possession of said lands quietly and peaceably, without any opposition, assigning them their boundaries which are: On the north, the boundary of Don Antonio Ortiz; on the south the ridge of the Piedra Pintada and the little table land of Guadalupe; on the east, the Sabino spring, with the Alto de Los Esteros, where the river forms a cañon below where the men were killed; and on the west, the Cuesta and the Little Bernal hill, which is the boundary of El Bado, with the understanding that the pastures and watering places are common, without injury to third parties."

March 8, 1834, Juan Martin, under verbal orders of the constitutional justice, delivered certain portions of the land as follows:

"At the town of Anton Chico, newly called by the name of 'the Avocation of Our Lord and Sangre de Christo,' on the 8th day of the month of March, 1834, by verbal orders from Citizen Juan Jose Cebeza de Baca, constitutional justice, in regard to the fact that there was scarcity of land for to cultivate, and the lands on Anton Chico being entirely vacant, without being cultivated by the legitimate individuals to whom it had been given seven or eight years previously, and that they are now entirely abandoned, because the Indians had attacked them so often that they had depopulated the place, and that now in order to administer to the necessities above mentioned of the unoccupied citizens having no lands and for the encouragement of agriculture, a matter of so much interest for the support of its inhabitants, I was directed to deliver the land to those who should claim it, and distribute what had been before granted to available and laborious hands, which I did on the above-mentioned day, delivering and donating to those newly applying for lands, reinstating those to whom land had formerly been granted, and donating the surplus in the name of the laws governing us, to whomsoever wished for lands who are as follows:

"To Biteroo Sandoval, former grantee, the point of the valley, without measurement. Vincente Seguro, donated 100 varas. Miguel Jaramillo, by purchase, 100 varas. Pablo Ortiz, donated 100 varas. Ignacio Aragon, donated 125 varas. Santiago Aragon, donated 75 varas. Julian Garcia, donated 100 varas and a strip. Bartolo Ocona, donated 100 varas. Miguelito Duran, former grantee, 200 varas. Jose de Jesus Duran, 100 varas and the remainder of the arroyo. Jose Antonio, the dumb, 100 varas. Francisco Sandoval, 100 varas. Gertrudis Mestas, 50 varas.

. "Which in fulfillment of my trust, and as actual alderman and acting constitutional justice, grant and donate to them in the name of the Lord we obey, in order that they may hold the same and not dispose of them until they are authorized to do so within the period required by law, and complying with the conditions, rights, and requirements exacted from all settlers, enjoin upon them particularly that they be always provided with arms, laboring together peaceably and friendly, so as not to be surprised by the savages, and in testimony whereof I signed at the aforementioned place, on the said day, month, and year, with two witnesses with whom I act in the ordinary way, to which I certify."

Thereafter this land became part of the United States, and in 1859 a petition for confirmation was presented by David Stewart, "for himself and in behalf of the heirs and legal representatives of the original grantees and present inhabitants of the town of Anton Chico." The petition recited that the land had been granted February 13, 1822, by Melgares to Salvador Tapia and others, who had possessed and cultivated the same and built dwellings, which "now compose the town of Anton Chico"; that the grant had never been surveyed; that said town existed in August, 1846, when the United States took possession of New Mexico; that the town was unincorporated, "but the heirs of the original grantees and the present lot holders know of no adverse claim to them"; and that the grantors had full power and authority to make said grant. The prayer was for confirmation. The petition was signed "J. Houghton, attorney for the Inhabitants of Anton Chico." Upon this petition the Surveyor General reported as follows:

"This case was set for trial on the 27th day of June, 1859. On the 24th day of January, 1822, Salvador Tapia, for himself and 16 others, petitioned the tribunal of independence supposed to be the corporation of the town of San Miguel for a tract of land known as Anton Chico on the Pecos river. The president of that corporation for want of power, the land asked for being beyond the jurisdiction of that body, referred the petition to the governor for his action in the premises. Melgares, the governor, on the 13th day of February of the same year, remanded the paper back to the corporation, with instructions to make application to the provincial deputation for its approval.

"The corporation of San Miguel repeating its want of jurisdiction in the matter, on the 9th of November, referred the matter to the provincial deputation. No further action appears to have been taken in the matter until the 2d of May, 1822, when Governor Melgares is purported to have granted the land to Manuel Rivera and 36 men and directed Manuel Baca, the constitutional justice of El Bado, to place the parties in possession, which was done on the 2d day of May of the same year. The claimants file a third document, dated March 8, 1834, purporting to be a distribution of the Anton Chico lands by Juan Martin under verbal authority from Juan Jose Cabesa de Baca, constitutional Justice of El Bado. It is stated in this document that the original grantees were compelled to leave the land on account of having been driven off by the Indians. Under this distribution 14 persons are placed in possession of a certain amount of arable land, varying from 50 to 100 varas, and among

them there are two of the former grantees. This document is considered as entirely superfluous and has no bearing whatever on the case.

"The documents marked A and C are original. Document B contains a copy of the grant made by Governor Melgares and certified to by Manuel Baca, the justice aforesaid. The documents filed are all disconnected and appear to bear no relation to each other. Evidence has been introduced by the claimants proving the town to have been in existence since 1839. This claim is contested by the heirs or Preston Baca, deceased, so far as it conflicts with the grant made to Juan E. Pino, of which they are the assigns. The grant made by Melgares on the 2d of May, 1822, severed the land from the public domain and placed it beyond the further search and control of the government.

"The instructions to this office provide that, the existence of a town when the United States took possession of the country being proven, is to be taken as prima facie evidence of a grant to said town, and as it is proven to have been in existence in 1839 and up to 1846, with the knowledge and tacit consent of the Mexican government, and was recognized as a town by that government, it is believed to be a good and valid grant, and the land claimed severed from the public domain. It is therefore approved and ordered to be transmitted to Congress for its action in the premises."

This report was confirmed by Congress June 21, 1860 (12 Stat. 71, § 3), being claim No. 29, as follows:

"That the private land claims in the territory of New Mexico, as recommended for confirmation by said surveyor general in his reports and abstract marked Exhibit A, as communicated to Congress by the Secretary of the Interior * * * numbered from 20 to 38, both inclusive, be, and the same are hereby, confirmed. * * *"

In pursuance of this confirmation, a patent dated March 27, 1883, was issued, which, after setting out in extenso the report of the surveyor general (above quoted) and a report of the boundaries as surveyed, proceeded as follows:

"'Now know ye that the United States of America in consideration of the premises and pursuant to the second [third] section of the act of Congress of third of March, Anno Domini one thousand eight hundred and sixty-nine, entitled 'An act to confirm certain private land claims in the territory of New Mexico,' have given and granted and by these presents do give and grant unto the said Manuel Rivera and others, being the thirty-six men to whom the grant was made by Fecundo Melgares, governor, May second, one thousand eight hundred and twenty-two, their children, heirs, successors and assigns, as in said grant provided, and which was confirmed as private land claim number twenty-nine by act of Congress, entitled 'An act to confirm certain private land claims in the territory of New Mexico,' approved June twenty-first, one thousand eight hundred and sixty, subject to all the provisions and conditions mentioned and set forth in the decree granting said tract of land as aforesaid and the record of juridical possession, and other documents accompanying the same, and made part of the report of Wm. Pelham, surveyor general of New Mexico, on the fifteenth of July, one thousand eight hundred and fifty-nine, and to the rights of all persons claiming under said provisions and conditions, the tract of land embraced and described in the foregoing survey, but with the further stipulation that in virtue of the provisions of the aforesaid act of Congress of twenty-first of June, A. D. one thousand eight hundred and sixty, that the foregoing confirmation shall only be construed as quitclaims or relinquishments on the part of the United States and shall not affect the adverse rights of any other person or persons whomsoever. To have and to hold the said tract of land with the appurtenances unto the said Manuel Rivera and others, being the thirty-six men to whom the grant was made, their children, heirs, successors and assigns. forever, with the conditions, provisions and stipulation hereinbefore referred to."

In considering the character of the grant and the effect thereon of the subsequent confirmatory act and patent, it is best to first examine the effect of the act and patent. The contention in that regard is whether the patent or the act controls, if there is any difference between them; and, next, as to the meaning of whichever dominates. The government has employed several methods of determining private title claims to land at the time of cession of territory to the United States. As said in Morrow v. Whitney, 95 U. S. 551, 554 (24 L. Ed. 456):

"Sometimes such claims have been submitted to boards of commissioners for approval or rejection, sometimes they have been referred to the judicial tribunals for determination, and sometimes they have been directly acted upon by Congress."

In the instance of such claims to land located in New Mexico the method employed was direct action by Congress through a statute confirming or rejecting the claims.

In referring to the effect of the above act of 1860 the Supreme Court said:

"This act was a final disposition by Congress of certain claims under Mexican grants for lands situate in the territory of New Mexico." Shaw v. Kellogg, 170 U. S. 312, 331, 18 Sup. Ct. 632, 640 (42 L. Ed. 1050).

No provision was made in the act for issuance of a patent, and apparently no patent was necessary to effectuate the act. Shaw v. Kellogg, 170 U. S. 312, 343, 18 Sup. Ct. 632, 42 L. Ed. 1050. The only office of a patent under such an act was thus defined by the Supreme Court:

"If, by a legislative declaration, a specific tract is confirmed to any one, his title is not strengthened by a subsequent patent from the government. That instrument may be of great service to him in proving his title, if contested, and the extent of his land, especially when proof of its boundaries would otherwise rest in the uncertain recollection of witnesses. It would thus be an instrument of quiet and security to him, but it could not add to the validity and completeness of the title confirmed by the act of Congress." Whitney v. Morrow, 112 U. S. 693, 695, 5 Sup. Ct. 333, 334 (28 L. Ed. 871).

Obviously the act of Congress must prevail here over the patent, if there be any difference between them. What, then, was the nature of the confirmation by the act of Congress? Was it of a title to individuals as such, or to them as representative of a community? The act itself is brief, and was of the claims "as recommended for confirmation by said surveyor general in his reports and abstract marked Exhibit A, as communicated to Congress by the Secretary of the Interior." We must therefore look to the report of the surveyor general to ascertain the character of title which he commended for confirmation. A perusal of that instrument leaves no doubt that such was a community title. The petition to the surveyor general was by the inhabitants of Anton Chico, and not by the heirs of the original grantees as such. It is true that the opening sentence of the petition, when taken alone, is ambiguous, in that it states:

"Your petitioners, David Stewart, for himself and in behalf of the heirs and legal representatives of the original grantees and present inhabitants of the town of Anton Chico," claim the land.

But this ambiguity is removed by other statements which are entirely inconsistent with any claim as individuals. Such are:

"That said town and settlement existed and was about the same as at present in August, A. D. 1846, when possession was taken of New Mexico by the authorities of the United States," and "the town of Anton Chico is not an incorporated town."

Such averments would have no place in a claim by individuals as such. Both would bear directly upon a community claim. The first, because one of the instructions from the Secretary of the Interior, authorized by the above act of 1854 (10 Stat. p. 308), and given in this instance to the surveyor general, was as follows (italics ours):

"In the case of any town, lot, farm, or pasture lots, held under a grant from any corporation or town, to which lands may be granted for the establishment of a town by the Spanish or Mexican government, or the lawful authorities, thereof, or in the case of any city, town, or village lot, which city, town, or village existed at the time possession was taken of New Mexico by the authorities of the United States, the claim to the same may be presented by the corporate authorities of the said town, or where the land on the said city, town, or village, was originally granted to an individual, the claim may be presented by or in the name of such individual, *and the fact being proved to you of the existence of such city, town, or village, at the period when the United States took possession, may be considered by you as prima facie evidence of a grant to such corporation,* or to the individuals under whom the lot holders claim."

The other statement that the town was unincorporated is to explain why individual inhabitants, and not the municipal corporate authorities, file the petition. The petition is signed by "J. Houghton, Attorney for the Inhabitants of Anton Chico."

The surveyor general regarded the petition and proceedings as by the inhabitants of Anton Chico, for he entitled the proceedings "Town of Anton Chico v. The United States." Again, the evidence before him dealt with the existence of the town prior to and at the time of annexation to the United States, and did not refer to the identity, possession, or occupation of the grant by any of the original grantees or their heirs. The basis of the finding was the "existence of a town, when the United States took possession of the country," and the recommendation is to confirm the grant to the town. Such statement and recommendation are:

"The instructions to this office provide that the existence of a town when the United States took possession of the country, being proven, is to be taken as prima facie evidence of a grant to said town, and as it is proven to have been in existence in 1839 and up to 1846, with the knowledge and tacit consent of the Mexican government, and was recognized as a town by that government, it is believed to be a good and valid grant, and the land claimed severed from the public domain. It is therefore approved and ordered to be transmitted to Congress for its action in the premises."

We think it conclusive that the recommendation of the surveyor general, and therefore the confirmation, was to the individuals as inhabitants of the town of Anton Chico.

[2] What effect has such confirmation upon any contrary claim which appellant might base upon a construction of the original granting instruments or facts in connection therewith? In a case involving a New Mexican grant confirmed by this same act and section, the Supreme Court said:

"The final action on each claim reserved to Congress is, of course, conclusive, and therefore not subject to review in this or any other forum. It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor general or his decision declaring the validity of the grant. They are embodied in his report, which was laid before Congress for its consideration and action." Tameling v. U. S. Freehold & Emig. Co., 93 U. S. 644, 662, 23 L. Ed. 998.

We are clearly concluded from going back of the confirmation of Congress. If we were not so concluded by the above-quoted authority, we would feel bound to conclude the facts in favor of a community grant by the decision in U. S. v. Sandoval, 167 U. S. 278, 17 Sup. Ct. 868, 42 L. Ed. 168. A decision of the questions there raised necessitated a determination of the character of the grant; that is, whether it was a grant to individuals as such or to the community. The statement of facts therein contains the instruments of the original grant, and referred to land adjoining that here involved. They are so strikingly similar, not only in essentials, but expression, to these here involved, as to suggest that those in this action were, as to form, copied therefrom. The court there held the grant to be to the community. Further, if we had no such guide as the Sandoval opinion and decision, we would decide upon the facts here presented that such was the nature of the grant.

Another point pressed here is the exclusion of certain deeds, with their recitals, which were introduced as ancient documents and designed to show deraignment of title from the original grantees to the entire tract. Since we hold that this grant was not to individuals as such, but to the community, such recitals become immaterial.

As to the contention based upon adverse possession, is suffices to say that the court found against such adverse possession. Such finding in a law case is equivalent to a verdict by a jury. As the evidence was conflicting, we should not disturb the finding of the court.

Our determination of the character of this title makes unnecessary any discussion or decision of the effect of the decision of the state court as an estoppel against appellant.

The judgment is affirmed.