# RIO ARRIBA LAND AND CATTLE COMPANY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 195. Argued March 9, 10, 1897. — Decided May 24, 1897.

In the grant which forms the subject of controversy in this case, the Spanish governor did not intend to grant nearly 500,000 acres to the applicants, in common, and the alcalde did not so understand it, but delivered juridical possession only of the various allotments made to petitioners in severalty.

*United States* v. *Sandoval,* 167 U. S. 278 followed, that, as to all such unallotted lands within exterior boundaries, where towns or communities were sought to be formed, the title remained in the Government for such disposition as it might see proper to make.

The fact that Congress may have confirmed similar grants cannot operate to justify the Court of Private Land Claims in adjudication of a case not coming within the terms of the law of its creation.

THIS was a petition by the Rio Arriba Land and Cattle Company filed in the Court of Private Land Claims for the confirmation of what was commonly called the Cañon de Chama Grant, situated in Rio Arriba County, New Mexico, and alleged to contain 472,763.95 acres.

It appeared that in 1806 a petition was addressed to the governor of the Territory, Alencaster, as follows:

" I, Francisco Salazar, ensign in the militia of Abiquiu, together with my brothers (hermanos) and twenty-eight other poor and needy citizens, appear before your excellency (and state), that I have examined a tract of land, unappropriated and unsettled, called the Chama River Cañon, situated about four leagues distant from this place, and for which we petition to your excellency in the name of the King and without injury to any third party, as we find ourselves without any land wherefrom to support ourselves, owing to the decease of our mother at the rancho off of which she supported us, and as the latter has this day been divided among nine heirs residing in other jurisdictions we find ourselves absolutely deprived of any place to plant and to enable us to pay tithes and first fruits.

" We therefore humbly ask and pray your excellency to heed this our petition, and we trust from the charitable heart of your excellency you will consider the same favorably, and we protest our petition not to be made in dissimulation and whatever be necessary, etc."

This petition was referred, July 6, 1806, by the governor to the alcalde in these words:

" The alcalde will report fully on this petition, giving the extent of the land in question, its boundaries, the proportion of irrigable land, and when he comes to say how many settlers it will accommodate and the application being made public he will report whether any damage may result to any of the surrounding settlers, either in regard to pasturage, water or watering places, and he will make personal examination re-

specting all these matters, to the end that action may be had in accordance with his report and subsequent questions avoided."

On July 14, 1806, the alcalde made the following report:

"I, Manuel Garcia de la Mora, chief alcalde, in obedience to the foregoing decree, proceeded personally to visit and examine the spot (rio) called the Chama River cañon, over all of which I passed with the greatest care and observation, as well the land itself as the places for taking out the heads of irrigating canals and the pastures and watering places, and I report that for pastures without fields and without any resulting damage there is one league from the last grant (that of the Martinezes) to the side on which the sun rises, and that thence to the western boundary, which divides the said Chama River cañon from the Gallina River, there are about two leagues, somewhat more or less, cultivable land, and the town being placed in the centre, the thirty-one families applying for it may be accommodated and land enough remain for the increase they may have in the way of children and sons in law (hijos y llernos), and the section of the country is a very desirable one, and the settlers may therefore proceed with their buildings, and for the other two boundaries there is assigned them on the north and on the south one league for pastures, for on these two sides no injury can result, as there is neither a settlement or grant now made or that might be made, and the heads of acequias along the length of the planting land there are five or six of them.

"With all the foregoing I have fulfilled your excellency's order. The same having been read faithfully and quite audibly to all the community, they replied that they had nothing to represent in regard to said petition, and that no one of them was injured, the land being uncultivated and unsettled, and the said cañon is distant from Abiquiu about five leagues."

On August 1, 1806, Governor Alencaster decreed:

"In pursuance of the foregoing report, that the said alcalde may proceed to the assignment of twenty-six lots of land capable of being planted with the equivalent of three cuartillas of wheat, one ditto or three almudes of corn, another three of beans, and of having erected on each of them a small house

with a. garden, and of these lots two of them adjoining one another will. be assigned to the Ensign Francisco Salazar and the remaining twenty-four to the individuals who, upon report made by the said alcalde, may obtain my decree that they be assigned lands, the said assignments to be made in such manner that lands may remain unassigned equally on the four sides, or at least on two of them, so that new assignments may be made in the future, and the lines bounding with the adjoining lands to be described in order that the rights to pastures and watering places may clearly appear; to the said parcel of lots held by the twenty-five settlers will be given the name 'San Joaquin del Rio de Chama"; and the said alcalde, having received the said twenty-four titles to settlers, will proceed to deliver and distribute, give possession, and make grant, in the name of His Majesty, to the twenty-four settlers aforesaid, and the said Ensign Salazar, being appointed justice and all the foregoing provisions being verified, the granting document will be remitted to me to be legalized as required, the proper duplicates (testimonios) to be given the parties interested and then the original to be returned, to be duly deposited among the archives of this office."

On March 1, 1808, the alcalde made this report:

" I, Manuel Garcia de la Mora, chief alcalde of the town of La Canada, proceeded to the rancho of San Joaquin, and in view of and in obedience to the foregoing decree of Lieutenant Colonel Joaquin del Real Alencaster, governor of this royal province, I, said chief alcalde, proceeded to the Chama River cañon, called the San Joaquin cañon, accompanied by the twenty-five settlers; and there appearing also fourteen other citizens without land, and his excellency having given me verbal instructions to the effect that should other persons come forward to increase the settlement land should also be assigned to them with the same rights as the others enjoy, and all the settlers being assembled, I proceeded with the distribution of the land to them, as appears from the quantities of land they received, noted in the list and certified by me, and into the possession of which I placed them, taking them by the hand and leading each settler over his own piece

of land and placing him in possession in the name of the King, whom may God preserve; and they ran joyfully over the land, plucking up weeds and casting stones and shouting aloud 'Long live the King that protects and helps us!' with which they remain in possession, naming the town whose site I pointed out to them, San Joaquin del Rio de Chama, and with which I have executed the foregoing decree and all of which authenticated with two instrumental witnesses, designating to the settlers as boundaries — on the north, the Ceballa valley; on the south, the Capulin; on the east, the boundary of the Martinezes; and on the west, the Little White hill, (segita blanca), for their pastures and watering places, and with a view to the coming of other settlers and the increase of families and descendants; all of which I signed with two instrumental witnesses and with the witnesses in my attendance, with whom I act by appointment for lack of a royal or public notary, there being none of any kind in this royal province; to which I certify."

Then followed the specific distribution of so many varas to each duly authenticated.

The record showed that these documents were produced from private hands, and it did not appear that they were ever returned to the governor to be legalized, or authority given for the execution of the various testimonios, and the delivery thereof to the grantees, the original remaining in the office of the public record as directed by the governor in his decree of August 1, 1806; nor did it appear that these various testimonios were issued and the original returned.

In 1832, one Juan de Jesus de Chacon, for himself and Mateo Garcia and Antonio Duran, presented a petition to the governor, asking that all the privileges allowed by law be permitted them, stating that two or three years before the alcalde Ortiz had placed them in possession of lands on the Gallina River; but that the present alcalde, Gallego, was attempting to dispossess them "in a manner most strange," considering that the land had been given to petitioners by a competent judge, and that they had cultivated it for two consecutive years and raised all the crops within their means;

and they applied to the governor that he would direct the alcalde to leave them at liberty to make such use as might appear proper of the lands lawfully belonging to them.

On April 2, 1832, the governor referred this petition to the *asesor general*, the *Licenciado* Barreiro. On the same day Barreiro made his report, stating that he had previously notified the alcalde of Abiquiu that he could not pass upon the rights of the parties on a simple communication, and recommending that the petitioners form an expediente of the whole matter and then refer the case to him; also directing, in regard to the possession given by Alcalde Ortiz, that nothing should be done until final adjudication, whereupon the governor made the following order:

" In order that the responsibility of the constitutional alcalde of Abiquiu may be covered, that the administration of justice may not experience delays prejudicial to the parties, and that the property may not be prejudiced, the said alcalde will proceed in conformity with the decision of the attorney general and will form an expediente of the whole and with new reference will decide as to what he may deem to be just, but in the meantime will respect the land in question, inasmuch as up to the present time the holders of it are not agreed as to the nullity of their possession, and consequently it will form a part of their property, as in such matters the regular formalities are indispensable, and without them the alcaldes cannot decide with the certainty required by the proper administration of justice."

On April 6, the alcalde Gallego reported that having examined the question between the parties he had directed that a suit of conciliation with two arbitrators named by the parties in litigation be brought in accordance with article No. 155; and he found that the alcalde not having carried out the will of Governor Alencaster by properly certifying the grant document and giving certified copies to the parties in interest and returning the original to the capital to be placed in the archives, for which omission and others, he adjudged the original possession not to be legal, and to be without right until confirmed by the governor. He also reported as to the ac-

tion of alcalde Ortiz that it was not legal, possession having been given by him without the production of any document approved by the governor, or any approval or certification of petition, as is usual, nor the proper proceedings taken, which was the province of the most excellent territorial deputation, with report of the proper ayuntamiento on the petition; and that a new possession must be given.

This report was returned by Barreiro, who required the alcalde to make up an expediente as originally directed. The alcalde summoned the parties, and their answers, replies and rejoinders were set forth at length. Salazar and his associates insisted that the possession of the lands at the Cañon de San Joaquin del Rio de Chama and the decree of Governor Alencaster were legal, but that the action of the Alcalde Ortiz was wholly without right. On these papers the asesor general made his report as follows:

"The statements of the parties having been examined, the question is made clear, and it appears that the possession given by the alcalde José Maria Ortiz is of no value because, even if he were an authority, he was not competent to give and partition lands, because this is an exclusive attribute of the territorial deputation.

"Under date of the 6th of February, I decided that with regard to the possession given by Ortiz that nothing should be done until I had resolved upon what I considered proper, but this was not in any way intended to approve the proceedings of the alcalde.

"Finally, I now say that the possession given at the Cañon de San Joaquin del Rio de Chama is legal because, even if there be any requisite lacking, it is not an essential requisite, but one of pure formality. With respect to the possession given, I am of the opinion that the alcalde Ortiz gave it without power and that it should be annulled, the right remaining with the parties aggrieved to petition the most excellent deputation to give them a good title, which will place them legally in possession of the lands which they may desire to possess, with the remark that the annullment must not be understood to extend to the possession which.

the children of the old settlers may hold, because these should come in for their part, as is expressed in the grant itself, but not others who are strangers."

On the 10th of May, 1832, Gallego made a partition of lands among eighteen interested parties, assigning to them lots of land of fifty varas each, and of uncultivated land of one hundred varas each.

The record did not show that the proceedings before the asesor general or his action and opinion were returned to or in any way approved by the governor, or the territorial deputation; nor that the partition and assignment by the alcalde were ever reported and approved; nor under what authority he acted.

There was considerable controversy as to the west boundary of the tract, but it was not contended that the proceedings of 1832 extended the area of the lands intended to be granted by Governor Alencaster in 1806.

Certain records of suits in 1880 and 1887 in the District Court of Arriba County, for the purpose of quieting the title and a partition of said lands, as between individual claimants, were set forth in the record.

The Court of Private Land Claims confirmed petitioner's claim to the extent of the lands lying in the Cañon del Rio de Chama, which were first actually apportioned among the settlers, and no more; and the company appealed.

*Mr. F. W. Clancy* for appellant.

*Mr. Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

Assuming, but without in any manner deciding, that Governor Alencaster had full power to make the grant in any quantity and in any manner he saw proper, we think it clear that he did not, and did not intend to, make a grant of nearly

half a million of acres to the original applicants, in common, and that the alcalde did not so understand it, and did not attempt to deliver juridical possession of such a tract, but only of the various allotments that were made to petitioners in severalty. The petition simply mentioned a tract called the Chama River Cañon, and the governor directed the alcalde to report on its extent and boundaries, the proportion of irrigable land, and how many settlers it would accommodate. The alcalde reported that he had personally visited the Chama River Cañon and passed over all the land with the greatest care and observation, and he said:

"The town being placed in the centre, the thirty-one families applying for it may be accommodated and land enough remain for the increase they may have in the way of children and sons in law, and the section of the country is a very desirable one, and the settlers may therefore proceed with their buildings, and for the other two boundaries there is assigned them on the north and on the south one league for pastures, for on these two sides no injury can result."

There is nothing in the terms of the grant to indicate that the governor intended to place thirty-one persons in possession, with the exclusive right of property, of a grant twenty-five miles north to south, and thirty miles from east to west. He says: "In pursuance of the foregoing report, the said alcalde may proceed to the assignment of twenty-six lots of land capable of being planted with the equivalent of three cuartillas of wheat, one ditto or three almudes of corn, another three of beans, and of having erected on each of them a small house with a garden." He directed that Salaza should have two lots, and "the remaining twenty-four to the individuals who, upon report made by the said alcalde, may obtain my decree that they be assigned lands," etc., and that "to the said parcel of lots held by the twenty-five settlers will be given the name 'San Joaquin del Rio de Chama.'" The governor then continued thus:

"And the said alcalde, having received the said twenty-four titles to settlers, will proceed to deliver and distribute, give possession, and make grant, in the name of His Majesty, to

the twenty-four settlers aforesaid, and the said Ensign Salazar, being appointed justice and all the foregoing provisions being verified, the granting document will be remitted to me to be legalized as required, the proper duplicates (testimonios) to be given the parties interested and then the original to be returned, to be duly deposited among the archives of this office."

Eighteen months thereafter the so-called act of possession was executed on a verbal order of the governor. The alcalde recites:

"I proceeded with the distribution of the land to them, as appears from the quantities of land they received, noted in the list and certified by me, and into the possession of which I placed them, taking them by the hand and leading each settler over his own piece of land and placing him in possession in the name of the King, whom may God preserve; and they ran joyfully over the land, plucking up weeds and casting stones and shouting aloud, 'Long live the King that protects and helps us!' with which they remain in possession, naming the town whose site I pointed out to them, San Joaquin del Rio de Chama, and with which I have executed the foregoing decree and all of which authenticated with two instrumental witnesses, designating to the settlers as boundaries — on the north, the Ceballa valley; on the south, the Capulin; on the east, the boundaries of the Martinezes; and on the west, the Little White hill (*cejita blanca*), for their pastures and watering places, and with a view to the coming of other settlers and the increase of families and descendants."

The alcalde does not state that he delivered the possession to any one individual or to all these individuals in common, of a large tract of land, but possession to each individual of the land to which he was entitled and no more, and this was accompanied by a description of the outboundaries within which allotments could be made by the proper governmental officials to persons that might come in thereafter.

Reference is indeed made to the use of the lands within the outboundaries for pastures and watering places, but this did not put them out of the class of public lands, and, whatever equities might exist, no title was conveyed.

We have just held in *United States* v. *Sandoval, ante,* 278, that as to all unallotted lands within exterior boundaries where towns or communities were sought to be formed, as in this instance, the title remained in the government for such disposition as it might see proper to make.

Moreover, it is clear that the alcalde had no authority to give possession of 475,000 acres of land to these thirty-one petitioners, even if he could have done so if expressly authorized by direct order of the superior authorities, which is not pretended.

We entirely agree with the holding of the Court of Private Land Claims, as indicated by their decree, that the act of possession, the alcalde's report and the governor's decree, taken together, show that the only title which was passed on or intended to be passed on was to the various allotments which were actually made. Nor can we concur in the view that the result is affected by the proceedings had before the asesor general in 1832. Whatever the judicial authority of this officer, his action did not amount to an adjudication that those who were living on the grant, or who went there in 1806 or 1808, were the absolute and unconditional owners of 475,000 acres of land, and, indeed, he seems to have been of opinion, not only that the unallotted lands were subject to disposition by the government, but that the proper authority to make such disposition was the territorial deputation.

It is also said that Congress has repeatedly confirmed similar grants, but the fact that Congress may have thus disposed of the public lands, in its discretion, cannot operate to justify the Court of Private Land Claims in adjudication of a case not coming within the terms of the law of its creation.

The proceedings in the District Court of Rio Arriba County are nothing to the purpose, as the title of this property, under the treaty of Guadalupe Hidalgo and the act of Congress of July 22, 1854, c. 103, 10 Stat. 308, was *sub judice.* The claimants were then proceeding on their claim before the surveyor general, and Congress, under that act, and an attempt to enforce that title and have it adjudicated by the

local courts, comes within the decision in *Astiazaran* v. *Santa Rita Land & Mining Co.*, 148 U. S. 80.

In that case it was said by Mr. Justice Gray, delivering the opinion of the court: " Undoubtedly, private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction, and were entitled to protection, whether the party had the full and absolute ownership of the land, or merely an equitable interest therein, which required some further act of the government to vest in him a perfect title.  But the duty of providing the mode of securing these rights, and of fulfilling the obligations imposed upon the United States by the treaties, belonged to the political department of the government; and Congress might either itself discharge that duty, or delegate it to the judicial department."

We have frequently reaffirmed the well-settled rule thus announced, and perceive no reason for reviewing it, although counsel suggests that we should do so as bearing on the jurisdiction of the territorial courts and in view of the so-called protocol signed by the commissioners of this country to Mexico, at the time of the exchange of the ratifications of the treaty of Guadalupe Hidalgo.  A sufficient account of that diplomatic incident will be found in President Polk's message of February 8, 1849, Ex. Doc. H. Rep., Second Session, 30th Cong., vol. 5; and in Mr. Secretary Bayard's letter of November 24, 1886, 3 Whart. Int. Dig., (2d ed.,) Appx. § 131, p. 885. We did not feel called upon to discuss it in *Astiazaran's case*, nor do we now in disposing of the case in hand, under the act of March 3, 1891, on this record.  *Botiller* v. *Dominguez*, 130 U. S. 238.

Furthermore, it is conceded that these records were put in evidence only to show that petitioner had succeeded, in part at least, to the rights of the original grantees.

*Decree affirmed.*