[No. 1384.    December 19, 1911.]

GEORGE W. BOND et al, Appellants, v. UNKNOWN HEIRS OF JUAN BARELA, Deceased, et al, Appellees.

### SYLLABUS (BY THE COURT).

1. The title papers of the town of Tome grant examined and held to be a community grant of the nature described in United States v. Sandoval, 167 U. S. 278; Rio Arriba Company v. United States, 167 U. S. 298, and United States v. Pena, 175 U. S. 500.

Appeal from the District Court for Valencia County, before M. C. MECHEM, Associate Justice. Affirmed. .

HANNA & WILSON for Appellants.

Grant was not a town grant. Ordinances of Philip II, 88, 89, Law 6, Book 4, Title 5, Recopilacion de las Indias; Law 10, Book 4, Title 5; U. S. v. Santa Fe, 165 U. S. 686; Hall Mexican Law 51; Law 2, Book 4, Title 7, Recopilacion de las Indias; Sheppard v. Harrison, 54 Tex. 95; U. S. v. Larkin, 58 U. S. 557; U. S. v. Morant, 123 U. S. 325; Fremont v. U. S. 58 U. S. 442; U. S. v. Arredondo et al, 31 U. S. 718; Hancock v. McKinney, 7 Tex. 449; Nicoll v. N. Y. & E. R. Co., 12 N. Y. 121; Chapin v. School Dist. No. 2, 35 N. H. 445; Star Brewery Co. v. Primas, 163 Ill. 652; Pablo Maes et al, v. Binger Herman etc., 183 U. S. 581; Strother v. Lucas, 37 U. S. 438; U. S. v. Pio Pico, 72 U. S. 536; Steinbach v. Stewart, 78 U. S. 577; U. S. v. Clarke, 16 Pet. 228; Rio Arriba Land & Cattle Co. v. U. S., 167 U. S. 298; Graham v. U. S., 71 U. S. 259; Maralin v. U. S., 1 Wall. 282; 46 Jur. Civil 9; 3 Sanchez Roman 277; 2 Novisima Recopilacion, lib. XI, tit. 8, Law 4, 736; New Orleans v. U. S., 35 U. S. 720; Carino v. Insular Gov., 212 U. S. 449; Lewis v. San Antonio, 7 Tex. 289; Partidas 3, Law 16, Title 29; Hall 30; 2 White 83; Payne v. Treadwell, 16 Cal. 221; Bouldin v. Phelps, 30 Fed. 547; Arayo v. Currell, 1 La. 528; United States v. Turner, 11 How. 663; Ott v. Soulard, 9 Mo. 573; United States v. Varela, 1 N. M. 599; Hopkins v. Kansas City Ry. Co., 79 Mo. 98; State v. Cleveland, 80 Mo. 108; Johnson v. Common Council, 16 Ind. 227; Temple v. State, 15 Tex. App. 304; Patterson v. State, 12 Tex. App. 222.

Grant was complete and perfect at time of Treaty of Guadalupe Hidalgo. United States v. Percheman, 7 Pet. 86; Ainsa v. N. M. & A. R. Co., 175 U. S. 76; Deut v. Emmeger, 14 Wall. 308; Tremier v. Stewart, 101 U. S. 797; U. S. v. Chaves, et al, 159 U. S. 452; Fletcher v. Fuller, 120 U. S. 534; Pinkerton v. Ledoux, 129 U. S. 354; U. S. v. Pico, 72 U. S. 536; Rio Arriba L. & C. Co. v. U. S., 167 U. S. 397.

Confirmation by Congress is an adjudication which cannot be reviewed in the courts. Hall's Mexican Law 53; U. S. v. Arredondo et al, 31 U. S. 718; U. S. v. Sandoval, 167 U. S. 278; Rio Arriba L. & C. Co. v. U. S.,

Bond, et al, v. Barela, et al, 16 N. M. 648.

167 U. S. 298; U. S. v. Chaves, 159 U. S. 452; Moore v. Robbins, 96 U. S. 535; U. S. v. Citizens' Trading Co., 93 Pac. 448; Greenameyer v. Coate, 212 U. S. 434; Hogan v. Page, 2 Wall. 607; Carpenter v. Rannells, 86 U. S. 138; Watterson v. Bennett, 18 La. Ann. 250; McDonald v. McCoy, 53 Pac. 421; Racahel v. Irwin, 8 Mart. 331; Connoyer v. Schaeffler, 89 U. S. 837; Rector v. Gibbon, 111 U. S. 291; Widdicombe v. Childers, 124 U. S. 405; Tameling v. U. S. Freehold etc. Co., 90 U. S. 662; Ojo del Apache Tract, Report No. 72, vol. 2, page 446, N. M. Private Land Claims; Report of Committee on Land Claims, vol. 1, N. M. Private Land Claims 113; Carpenter v. Montgomery, 13 Wall. 480; Salmon v. Symonds, 30 Cal. 301; Catron v. Laughlin, 11 N. M. 604; Ford's Heirs v. Morancy, 14 La. Ann. 77; Southern Pac. R. Co. v. Wiggs, 43 Fed. 333; Hardy v. Harbin, Fed. Cas. No. 6060; Climer v. Selby, 10 La. Ann. 182; Townsend v. Greeley, 5 Wall. 326; Board v. Federy, 3 Wall. 478; Bernier v. Bernier, 147 U. S. 247; Watson v. Sutro, 86 Cal. 527; Gates v. Salmon, 35 Cal. 593; Martin v. Walker, 58 Cal. 586; Luco v. de Toro, 91 Cal. 405; Royston v. Miller, 76 Fed. 50; Stein v. McGrath, 30 So. 792, Ala. Incorporation of grant. C. L. 1897, secs. 2149, 2160, 2163, 2166, 2176.

Due process of law. Clark v. Mitchell, 64 Mo. 564; Taylor v. Porter, 4 Hill. 140; Wynehamer v. People, 2 Parker, Cr. R. 421; in re Hatch, 43 N. Y. Sup. Court 89; Dorman v. Buick, 32 Cal. 241; Stuart v. Palmer, 74 N. Y. 183; Foulke v. Bond, 41 N. J. L. 527; Roll et al v. Everett et al, 73 N. J. L. 647; Ord v. de la Guerra, 18 Cal. 67; Busch v. Huston, 75 Ill. 343; Ewer v. Lovell, 9 Gray 276; Ashley v. Rector, 20 Ark. 359; Freeman on Cotenancy, 2 ed. 99; Maloney v. Van Winkle, 21 Cal. 582; 30 Cyc. 177; Richard Mitchell et al v. Sylvanus Starback et al, 10 Mass. 5; Lavalle v. Strobel, 89 Ill. 384.

FRANK W. CLANCY for Appellees.

Town grant. Escriche Dictionary, ed. 1847; Recopilacion de las Leyes de las Indias, Law 1, title 11, book

4; law 2, title 7, book 4; Pinkerton v. Ledoux, 129 U. S. 354; Van Reynegan v. Bolton, 95 U. S. 35; More v. Steinbach, 127 U. S. 79; Law 2, title 12, book 4, Hall's Mexican Law 18, sec. 33; Rio Arriba L. & C. Co. v. U. S., 167 U. S. 397.

Confirmation by Congress is an adjudication which cannot be reviewed in the courts. Tomeling v. U. S. Freehold etc. Co., 93 U. S. 662; U. S. v. Maxwell Land Grant Co., 121 U. S. 366; Lafayette's Heirs v. Kenton, 18 How. 198; Astiazaran v. Santa Rita Co., 148 U. S. 82; Botilla v. Dominguez, 130 U. S. 246; Mitchell v. Furman, 180 U. S. 436; Barker v. Harvey, 181 U. S. 486.

## OPINION OF THE COURT.

POPE, C. J.—The appellants, Bond and others, filed suit for partition and quieting of title against the unknown heirs of a large number of persons and the unknown owners and proprietors and claimants of interest in what is known as the Tome grant in Valencia county, New Mexico. The persons whose unknown heirs were sued were the persons alleged to have been the grantees of that grant being the persons named in the grant papers to be presently more fully noticed. The case was decided upon the pleadings. The controlling question is whether the grant papers made in 1739 constituted a grant to the parties named therein for the entire tract or whether they constituted simply a grant to such parties of the allotments described therein as set aside to them leaving the unallotted lands for future settlers and the outlying pasture and non-agricultural lands in the crown. It is contended by the plaintiffs and appellants that if the former is true then plaintiffs who apparently held by succession of title from some of the original grantees are entitled to have partition as against others similarly holding interests. It is contended on behalf of the defendants, among them being the corporation known as the Town of Tome, that the legal effect of the grant when made was, save as to the small pieces of land actually allotted, to pass no title from the crown of Spain and that when the United States succeeded to the sovereignty in

1848 the title to all save these allotments passed into the United States, and that when the United States by act of Congress approved December· 22, 1858, confirmed the grant to the town of Tome and when patent issued to said town pursuant to said confirmation the title thus held previously by he government passed directly to the town unburdened with any trust on behalf of the heirs of the parties named in the original title papers and thus with no claims upon it which plaintiffs may here assert. This involves a consideration of the nature of the original grant papers. These are as follows: "Year 1739. New Settlement of 'Nuestra Senora de la Concepcion de Tome Dominguez,' instituted and established by Don Gaspar Domingo de Mendoza, governor and captain general of this Kingdom of New Mexico, contained in four pages, including this. Sir Senor Justice: All the undersigned appear before you, and all and jointly, and each one for himself, state, and in order that his excellency the governor may be pleased to donate to them the land called Tome Dominguez, granted to those who first solicited the same and who declined settling thereon, we therefore ask that the land be granted to us; we therefore pray you to be pleased, (eaten by mice) at that time to (eaten by mice), said settlers we being disposed to settle upon the same within the time prescribed by law; we pray you to be pleased to give us the grant which you have caused to be returned, as you are aware that our petition is founded upon justice and necessity, our present condition being very limited, with scarcity of wood, pasture for our stock, and unable to extend our cultivation and raising of stock in this town of Albuquerque, on account of the many footpaths encroaching upon us, and not allowed to reap the benefit of what we raise, and, in a measure, not even our crops on account of the scarcity of water, and with most of us our lands are of little extent and much confined, etc. In view of all which we pray and request you to be pleased to grant our petition, by doing which we will receive grace with justice; and we swear in all form that it is not done in malice; we protest costs and whatever may be necessary. Juan Barela, Josef Salas, Juan

Bond, et al, v. Barela, et al, 16 N. M. 648.

Ballejos, Manuel Carrillo, Juan Montano, Domingo Sedillo, Matias Romero, Bernardo Ballejo, Gregorio Jaramillo, Francisco Sanchez, Pedro Romero, Phelipe Barela, Lugardo Ballejos, Augustin Gallegos, Alonzo Perea, Thomas Samora, Nicholas Garcia, Ignacio Baca, Salvador Manuel, Francisco Silva, Francisco Rivera, Juan Antonio Zamora, Miguel Lucero, Joachim Sedillo, Simon Zamora, Xpritoval Gallegos, Juan Ballejos, Grande, Jacinto Barela, Diego Gonzales. In this town of San Phelipe de Albuquerque, on the second day of the month of July, in the year one thousand and seven hundred and thirty-nine, before me, Captain Juan Gonzales, Baz, Senior Justice of this town and its jurisdiction, came the persons contained in the above petition which by me seen, I state: That I cannot deliver to them the grant asked for, as it has been returned by order of my governor, until I consult with his excellency, to whom this petition is referred, that seeing it, his excellency may determine whatever may be proper. I have so ordered and signed, acting by appointment, with two attending witnesses, in the absence of a public or royal notary, there being none in this kingdom. Date, ut supra.

"JUAN GONZALES BAZ.

"Witness:

"B. S. R. ALEJANDRO GONZALES,
"SALVADOR MARTINEZ.

"Don Gaspar Domingo de Mendoza, governor and captain general of this kingdom of New Mexico, for his majesty, having seen the above, I consider it as presented, and in view of the individuals therein contained, grant to them, in the name of his majesty, whom may God preserve, the land petitioned for, called the land of Tome Dominguez, for themselves, their successors, and whoever may have a right thereto under the conditions and circumstances required in such cases, and which is to be without prohibition to any one desiring to settle the same, holding and improving it during the time required by law. In view of which, I should order, and did order, that said senior justice or his lieutenant, whose duty it is, shall

place them in possession of the aforementioned lands, giving in all cases to each one the portion he may be entitled to in order to avoid difficulties which may occur in the future. I have so provided, ordered, and signed, acting by appointment, with attending witness, in the absence of a royal or public notary, there being none other.

"Don Gaspar Domingo Mendoza.
"Antonio de Herrera,
"Joseph Terrus.

"Possession. In the new settlement of 'Nuestra Senora de Concepcion de Tome Dominguez,' instituted and established by Don Gaspar Mendoza, actual governor and captain general of this Kingdom of New Mexico, on the thirtieth day of the month of July, in the year one thousand seven hundred and thirty-nine. I, Captain Juan Gonzales Baz, senior justice and war captain of the town of San Phelipe de Albuquerque, and the districts within its jurisdiction, by virtue of the decree issued and above provided by said governor, the royal possession ordered to be given being published and promulgated, and the parties concerned being together, I proceeded to the above mentioned place, and all being present, I notified them of the decree; I took them by the hand, walked with them over the land; they cried out, pulled up weeds, threw stones, as required by law; and having placed the new settlers in possession of said lands, I gave them the title and vocation they should have in the settlement, which bears the name aforementioned of 'Nuestra Senora de la Concepcion de Tome Dominguez,' whose titular feast they promised to observe and celebrate every year. And the first proceedings having been noted, I proceeded to establish the boundaries as contained in the first petition, which are as follows: On the west the Del Norte river, on the south the place commonly called 'Los Tres Alamos,' on the east the main ridge called San Dia, and on the north the point of the marsh hill called Tome Dominguez; at which principal boundaries I ordered them to perpetuate their existence with permanent land marks, pointing out to them, also, as a means of good economy, their common pastures,

water and watering places, and uses and customs for all, to be the same without dispute, with the condition that each one is to use the same without dispute in equal portions, the richest as well as the poorest; and by virtue of what has been ordered, I pronounce this royal possession as sufficient title for themselves, their children, heirs and successors, to hold their lands now and forever at their will; directing them, as I do direct them, to settle the same within the time prescribed by the royal ordinances; and for their greater quietude, peace, tranquility and harmony, I proceeded to point out the land each family should cultivate, each one receiving in length a sufficient quantity to plant one fanega of corn, two of wheat, garden and house lot, as follows: To Francisco Sanchez, the general boundary on the west, the Del Norte river and (torn) arroyo or dry branch running out from said river, (torn) bounded by lands of Matias Romero, (torn) with them the lands of Ygnacio Baca; with them Lugardo Ballejo; with these the lands of (torn) these are bounded by the lands of Bernardo Ballejo; (torn) lands of Juan Ballejo el grande; with these (torn) Gregorio Jaramillo; with these are bounded the lands of Josefa Gutierez; with these a body of the lands of her brother, Gregorio Gutierez, (torn) the lands bounded by them; those of Miguel Lucero, (torn) with them those of Francisco de Silva; with these are those of Juan Ballejo, the youngest; with these are bounded the lands of Manuel Carrillo and his sister, Jacinta Martin Carrillo, (torn) a body of the lands of Juan Barela, (torn) Ventura Romero, Domingo Sedillo, (torn) Salvador Manuel Marquez, Manuel Carrillo, (torn) Jacinto Barela and Augustin Gallegos (torn) on the east, (torn) Cristobal Gallegos, Felipe Barela, (torn) Simon Zamora and Juan Montano, (torn) which are distributed on uncultivated ground in order that (torn) appeared to be agreed upon (torn) possession was given (torn) all having expressed themselves as satisfied now and in the future, without failing to comply in one single instance with what had been ordered, nor in which said settlers should observe. And in order that it may so appear, I signed, acting by appoint-

ment, with attending witnesses, in the absence of a public and royal notary, there being none in this kingdom, on said day, ut supra, &c. corrected.

"FRANCISCO SANCHEZ,
"JUAN GONZALES BAZ.

"Witnesses:
    "ALEJANDRO GONZALES,
    "YSIDRO SANCHEZ."

In determining the controlling question in the case, the work of this court, as doubtless was the work of the court below is greatly facilitated by the course of litigation involving certain grants before the court of private land claims, established by the Act of March 3, 1891, to deal with the Spanish and Mexican land grants in the Southwest. That court had before it four grants, the decisions of which throw great light upon the present case. The first of these grants was known as the San Miguel del Bado grant which was prosecuted before the court of private land claims under the title of United States v. Sandoval. This case subsequently went to the Supreme Court of the United States and is reported under the title of the United States v. Sandoval, 167 U. S. 278. The title papers in that case were as follows: "I, Lorenzo Marquez, resident of this town of Santa Fe, for myself and in the name of fifty-one men accompanying me, appear before your excellency, and state that in consideration of having a very large family, as well myself as those accompanying me, though we have some land in this town, it is not sufficient for our support, on account of its smallness and great scarcity of water, which, owing to the great number of people, we cannot all enjoy, therefore we have entered a tract of land on the Rio Pecos, vacant and unsettled, at the place commonly called El Vado, and where there is room enough not only for us, the fifty-one who ask it, but also for everyone in the province not supplied. And its boundaries are, on the north the Rio de la Vaca, from the place called the Rancheria to the Agua Caliente; on the south the Canon Blanco; on the east the Cuesta, with the little hills of Bernal, and on the west the place com-

Bond, et al, v. Barela, et al, 16 N. M. 648.

monly called the Guzano, which tract we ask to be granted
us in the name of our sovereign, whom may God preserve;
and among these fifty-one men petitioning are thirteen In-
dians, and among them all are twenty-five fire arms, and
they are the same persons who appear in the subjoined list
which I present in due form; and we unanimously and
harmoniously, as one person, do promise to enclose our-
selves in a plaza well fortified with bulwarks and towers,
and to exert ourselves to supply all the firearms and am-
munition that it may be possible for us to procure. And,
as we trust in a compliance with our petition, we request
and pray that your excellency be pleased to direct that we
be placed in possession in the name of his royal majesty
our sovereign, whom may God preserve. And we declare
in full legal form that we do not act with dissimulation,
etc.

"LORENZO MARQUEZ,

"For himself and the petitioners."

(The list referred to does not appear).

"DECREE.

"At the town of Santa Fe, Capital of this Kingdom
of New Mexico, on the 25th day of the month of Novem-
ber, one thousand seven hundred and ninety-four, I,
Lieutenant Colonel Fernando Chacon, Knight of the Order
of Santiago, civil and military governor of said Kingdom,
subinspector of the regular troops therein, and inspec-
tor of the militia thereof, for his Majesty, (whom may
God preserve,) having seen the foregoing document and
petition of Lorenzo Marquez for himself and in the name
of fifty-one men, should and did direct the principal
Alcalde of this town, Antonio Jose Ortiz, to execute said
grant as requested by the petitioners, so that they, their
children and successors may have, hold and possess the
same in the name of his Majesty, observing at the same
time the conditions and requisites required in such cases to
be observed, and especially that relative to not injuring
third parties. Thus I ordered, provided and signed
with the witnesses in my attendance, with whom I act for
want of royal or public notary, of which there is none in

said Kingdom, and upon this common paper, there being none of any seal, to which I certify. CHACON." "Attending: FERNANDO LAMELAS.

"On the 26th day of the month of November, one thousand seven hundred and ninety-four, I, Antonio Jose Ortiz, captain of the militia and principal alcalde of the town of Santa Fe, in the pursuance of the order of Lieutenant Colonel Fernando Chacon, Knight of the Order of Santiago, and civil and military governor of this Kingdom, before proceeding to the site of El Vado, I, said principal alcalde, in company with two witnesses, who were Xavier Ortiz and Domingo Santistevan, the fifty-two petitioners being present, caused them to comprehend the petition they had made, and informed them that to receive the grant they would have to observe and fulfill in full form of law the following conditions: First. That the tract aforesaid has to be in common, not only in regard to ourselves, but also to all the settlers who may join them in the future. Second. That with respect to the dangers of the place, they shall have to keep themselves equipped with firearms and bows and arrows, in which they shall be inspected as well at the time of settling as at any time the alcalde in office may deem proper, provided that after two years settlement all the arms they have must be firearms, under the penalty that all who do not comply with this requirement shall be sent out of the settlement. Third. That the plaza they may construct shall be according as expressed in their petition; in the meantime they shall reside in the Pueblo of Pecos where there are sufficient accommodations for the aforesaid fifty-two families. Fourth. That to the alcalde in office in said pueblo they shall set apart a small separate piece of these lands for him to cultivate for himself at his will, without their children or the successors making any objection thereto, and the same for his successor in office. Fifth. That the construction of their plaza as well as the opening of acequias and all other work that may be deemed proper for the common welfare, shall be performed by the community with that union which in their government they must preserve. And when this was heard and

understood by each and all of the aforesaid persons, they accordingly unanimously responded that they understood and heeded what was communicated to them. Wherefore, I took them by the hand and announced in clear and intelligible words that in the name of his Majesty (God preserve him) and without prejudice to the royal interest or that of any third party, I led them over said lands, and they plucked up grass, cast stones, and shouted 'long live the King,' taking possession of said land quietly and peaceably, without any objection, pointing out to them the boundaries, which are, on the north the Rio de la Vaca, from the place called the Rancheria to the Agua Caliente; on the south, the Canon Blanco; on the east, the Cuesta with the little hills of Bernal, and on the west, the place commonly called the Guzano, notifying them that the pastures and watering places are in common, and that in all time it may so appear, I, acting by appointment, for want of a notary, there being none in this jurisdiction, signed this with my attending witnesses, with whom I act. To which I certify.

"Antonio .Jose Ortiz.

"Attending:

"Jose Campo Redondo,

"Antonio Jose Ortiz.

"This copy agrees with its original on file among the archives of this town, and is faithfully and legally made, compared and corrected. In testimony whereof, I make my customary sign manual in this town of Santa Fe on the eighth day of the month of November, one thousand seven hundred and ninety-four.

"(Signed) Antonio Jose Ortiz.

"(Seal) Fourth real.

"Fourth seal, fourth real, year one thousand seven hundred and ninety-eight and ninety-nine.

"(Seal)

"At this place, San Miguel del Bado del Rio de Pecos, jurisdiction of the capital town of Santa Fe, New Mexico, on the twelfth day of March in the present year, one thousand eight hundred and three, I, Pedro Baptista Pino,

justice of second vote of the town of Santa Fe and its jurisdiction, by verbal order of Colonel Fernando Chacon, governor of this province, have proceeded to this said settlement for the purpose of distributing the lands which are under cultivation to all the individuals who occupy said settlement; and having examined the aforesaid cultivated land, I measured the whole of it from north to south and then proceeded to lay off and provide the several portions, with the concurrence of all parties interested, until the matter was placed in order according to the means myself and the parties interested deemed the best adapted to the purpose; in order that all should be satisfied with their possessions, although said land is very much broken on account of the many bends in the river. And after the portions were equally divided in the best manner possible, I caused them to draw lots, and each individual drew his portion, and the number of varas contained in each one portion was set down, as will appear from the accompanying list, which contains the number of the individuals who reside in this precinct, amounting to the number of fifty-eight families, between whom all the land was divided, excepting only the portion appertaining to the justice of this precinct, as appears by the possession given by the said governor, and another small surplus portion which by the consent of all is set aside for the benefit of the blessed souls in purgatory, on condition that the products are to be applied annually to the payment of three masses, the certificates for which to be delivered to the alcalde in office of said jurisdiction. And after having made the distribution I proceeded to mark out the boundaries of said tract from north to south, being on the north a hill situated at the edge of the river above the mouth of the ditch which irrigates said lands, and on the south the point of the hill of pueblo and valle called Temporales, a large portion of land remaining to the south, which is very necessary for the inhabitants of this town who may require more land to cultivate, which shall be done by the consent of the justice of said town who is charged with the care and trust of this matter, giving to each one of those contained in the list the amount he may

require and can cultivate; and. after having completed all the foregoing, I caused them all to be collected together and notified them that they must each immediately erect mounds of stone on the boundaries of their lands so as to avoid disputes; and I also notified them that no one was privileged to sell or dispose of their land until the expiration of ten years from this date, as directed by said governor, who, if he be so pleased, will certify his proper approval at the foot of this document, of which a copy shall remain in this town and the original be deposited in the archives where it properly belongs. Done in the aforesaid town, on the day, month and year above mentioned. Signed with my hand, with two attending witnesses, with whom I act in the absence of a public or royal notary, there being none of any description in this kingdom. I certify.

"(Signed) PEDRO BAPTISTA PINO. "Attending: JOSE MIGUEL TAFOYA."

Here followed the list of fifty-eight individuals, with the number of varas each one received, running from forty-nine varas in one instance to two hundred and thirty in another, sixty-five varas being allotted in thirty-eight instances. "There are contained in this list fifty-eight families. San Miguel del Bado, March twelfth, one thousand eight hundred and three.

PEDRO BAPTA. PINO.

"Given gratis, together with twenty-odd leagues travel.

"(Pino's Rubric).

"By virtue of what has been done by Pedro Pino, senior justice of second vote of this capital town of Santa Fe concerning the distribution of lands made in the name of his Majesty to the residents of the new town of El Bado, known as San Miguel, I declare the aforesaid residents of El Bado the lawful owners thereof, approving and confirming the possession given by said Senior Justice Pedro Pino; and in order that it may so appear in all time, I signed this at Santa Fe, New Mexico, on the 30th day of March, 1803.

"FERNANDO CHACON."

The court of private land claims held that the effect of these muniments of title was to vest in the parties named therein the title to the entire tract of land described. Upon appeal, however, the Supreme Court of the United States held that the title of the crown was divested only as to the allotments described in the several acts of possession and the remainder continued in the former sovereignty and passed to the United States by the treaty.

The claim of the government which was sustained in that case is stated by the Supreme Court as follows: "The contention on behalf of the United States is that the court of private land claims had no power to confirm lands situated as these were, within the outboundaries, that had not been allotted prior to the date of the treaty, because under the laws of Spain and Mexico, the *jus disponendi* of all unassigned lands remained in the government and passed to the United States." Dealing with this contention the court said: "Did the fee to lands embraced within the limits of the pueblo and intended for community use continue to remain in the sovereign or did it pass to the pueblo? Answering this by reference to the previous case of the United States v. Santa Fe, 165 U. S. 675, the court said: "Under the laws of the Indies, lands not actually allotted to settlers remained the property of the King, to be disposed of by him or by those on whom he might confer that power. * * * Towns were established in two ways: By their formation by empresarios or contractors, the title to the lands granted vesting in the contractors and settlers, minute provisions being made in relation thereto. By individuals associating themselves together for that purpose and applying to the governor of the province, through whose action a city, villa or place was established. These municipalities appear to have been quasi corporations sub modo, and their ayuntamientos exercised political control over the pueblos and over surrounding country attached to their jurisdiction. The alcalde made allotments subject to the orders of the ayuntamiento, and they were again apparently subject to the provincial deputation or an equivalent superior body. At all events unallotted lands were subject to the disposition of the

government." The next case dealing with the subject was Rio Arriba Land & Cattle Co. v. United States, appealed from the court of private land claims and reported in 167 U. S. 298. The title papers in that case were as follows: "I, Francisco Salazar, ensign in the militia of Abiquiu, together with my brothers (Hermanos) and twenty other poor and needy citizens, appear before your excellency (and state), that I have examined a tract of land, unappropriated and unsettled, called the Chama River Canon, situated about four leagues distant from this place, and for which we petition your excellency in the name of the King and without injury to any third party, as we find ourselves without any land wherefrom to support ourselves, owing to the decease of our mother at the rancho off of which she supported us, and as the latter has this day been divided among nine heirs residing in other jurisdictions we find ourselves absolutely deprived of any place to plant and to enable us to pay tithes and first fruits. We therefore humbly ask and pray your excellency to heed this our petition, and we trust from the charitable heart of your excellency you will consider the same favorably, and we protest our petition not to be made in dissimulation and whatever be necessary, etc." This petition was referred, July 6, 1806, by the governor to the alcalde in these words: "The alcalde will report fully on this petition, giving the extent of the land in question, its boundaries, the proportion of irrigable land, and when he comes to say how many settlers it will accommodate and the application being made public he will report whether any damage may result to any of the surrounding settlers, either in regard to pasturage, water or watering places, and he will make personal examination respecting all these matters, to the end that action may be had in accordance with his report and subsequent questions avoided." On July 14, 1806, the alcalde made the following report: "I, Manuel Garcia de la Mora, chief alcalde, in obedience to the foregoing decree, proceeded personally to visit and examine the spot (rio) called the Chama River Canon, over all of which I passed with the greatest care and observation, as well as the land itself and the places for taking out the heads of

irrigating canals and the pastures and watering places,. and I report that for pastures without fields and without any resulting damage there is one league from the last grant (that of the Martinezes) to the side on which the sun rises, and that thence to the western boundary, which divides the said Chama river canon from the Gallina river, there are about two leagues, somewhat more or less, cultivable land, and the town being placed in the center, the thirty-one families applying for it may be accommodated and land enough remain for the increase they may have in the way of children and sons-in-law (hijos y llernos), and the section of the country is a very desirable one, and the settlers may therefore proceed with their buildings, and for the other two boundaries there is assigned them on the north and on the south one league for pastures, for on these two sides no injury can result, as there is neither a settlement or grant now made or that might be made, and the heads of acequias along the length of the planting lands there are five or six of them. With all the foregoing I have fulfilled your excellency's order. The same having been read faithfully and quite audibly to all the community, they replied that they had nothing to represent in regard to said petition and that no one of them was injured, the land being uncultivated and unsettled, the said canon is distant from Abiquiu about five leagues."

On August 1, 1806, Governor Alencaster decreed: "In pursuance of the foregoing report, that the said alcalde may proceed to the assignment of twenty-six lots of land capable of being planted with the equivalent of three cuartillas of wheat, one ditto or three almudes of corn, another three of beans, and of having erected on each of them a small house with a garden, and of these lots two of them adjoining one another will be assigned to the Ensign Francisco Salazar and the remaining twenty-four to the individuals who, upon report made by the said alcalde, may obtain my decree that they be assigned lands, the said assignments to be made in such manner that lands may remain unassigned equally on the four sides, or at least on two of them, so that new assignments may be

made in the future, and the lines bounding with the adjoining lands to be described in order that the rights to pastures and watering places may clearly appear; to the said parcel of lots held by the twenty-five settlers will be given the name of 'San Joaquin del rio de Chama;' and the said alcalde, having received the said twenty-four titles to settlers, will proceed to deliver and distribute, give possession, and make grant, in the name of his Majesty, to the twenty-four settlers aforesaid, and the said Ensign Salazar, being appointed justice and all the foregoing provisions being verified, the granting document will be remitted to me to be legalized as required, the proper duplicates (testimonios) to be given the parties interested and then the original to be returned, to be duly deposited among the archives of this office."

On March 1, 1808, the alcalde made this report: "I, Manuel Garcia de la Mora, chief alcalde of the town of La Canada, proceeded to the rancho de San Joaquin, and in view of and in obedience to the foregoing decree of Lieutenant Colonel Joaquin del Real Alencaster, governor of this royal province, I, said chief alcalde, proceeded to the Chama river canon, called the San Joaquin canon, accompanied by the twenty-five settlers; and there appearing also fourteen other citizens without land, and his excellency having given me verbal instructions to the effect that should other persons come forward to increase the settlement land should also be assigned to them with the same rights as the others enjoy, and all the settlers being assembled, I proceeded with the distribution of the land to them as appears from the quantities of land they received, noted in the list and certified by me, and into the possession of which I placed them, taking them by the hand and leading each settler over his own piece of land and placing him in possession in the name of the King, whom may God preserve; and they ran joyfully over the land, plucking up weeds and casting stones and shouting aloud 'Long live the King that protects and helps us.' With which they remain in possession, naming the town whose site I pointed out to them, San Joaquin del Rio de Chama, and with which I have executed the foregoing decree and all

of which authenticated, with two instrumental witnesses, designating to the settlers as boundaries—on the north, the Cebolla Valley; on the south, the Capulin; on the east, the boundary of the Martinezes; and on the west, the Little White hill, (segita blanca), for their pastures and watering places and with a view to the coming of other settlers and the increase of families and descendants; all of which I signed with two instrumental witnesses and with the witnesses in my attendance, with whom I act by appointment for lack of a royal or public notary, there being none of any kind in this royal province; to which I certify."

In that case it was likewise contended that the title to the entire tract passed to the parties named in the papers, but this contention, following United States v. Sandoval, supra, was overruled, the court holding "that as to all unallotted lands within exterior boundaries where towns or communities were sought to be formed, as in this instance, the title remains in the government for such disposition as it might see proper to make," and that "the only title which was passed on or contended to be passed on was to the various allotments which were actually made." Another case in which the same question is involved was United States v. Pena, which is reported under that title, on appeal from the court of private land claims, in 175 U. S. 500. The title papers in that case are thus described in the opinion of the court just cited: "In 1836, Jose Julian Martinez and others made application to the ayuntamiento of Ojo Caliente for a tract of public land, called 'the Petaca.' That body declared its opinion that the grant should be made, and thereupon the governor signed this order: "Santa Fe, Dec. 25, 1836. Having seen the action of the ayuntamiento of Ojo Caliente of date 22 instant, in which they say there is no objection to granting the applicant and his associates the land mentioned, the former grantees not possessing now any right herein, they having abandoned the same, the alcalde of said place will place those who now apply for the same in possession thereof in the required form and in conformity with the law on the subject, setting forth the general donation, in

which shall necessarily be stated the boundaries of said possession, and without prejudice to any third party; also binding the grantees to the obligations prescribed by the laws to acquire title, for which purpose the alcalde shall take charge of the general document of distribution, which shall be for the archives, and he shall give testimonies therefrom, as may be requested of him, on payment of his corresponding fees. PEREZ."

In pursuance of this order the alcalde proceeded to give juridical possession, and this is the report of his action: "For the years one thousand eight hundred and thirty-six and eight hundred and thirty-seven. At Santa Cruz del Ojo Caliente, jurisdiction of this name, on the 25th day of the month of March, one thousand eight hundred and thirty six, in compliance with the decree of the civil and military governor of the Territory of New Mexico, Alvino Perez, of date February 25, of the same year, in which he directs me to place in possession the petitioners who have applied for the Petaca tract of land, and as is set forth in their petition of date 29th of January, of the same year, I proceeded to distribute said land in the presence of the parties interested, giving to each one of those mentioned in the list one hundred and fifty varas in a direct line designating to them as their boundaries on the south the entrance to the canoncito and lands of Jose Miguel Lucero, on the north the hill commonly called the Tio Ortiz Hill, on the east, creek of the aguaje of the Petaca, and on the west the boundary of the Vallecito grant, within which limits the said new grantees were located. Of these I donated only to citizen Felipe Jaquez from the boundary of Vincente Martin to that of Eusebio Chaves, the land being a narrow strip and of little utility; thereupon I donated to citizen Manuel Lujan two small valleys, which were not measured with the line and reach to the distribution of the said canoncito, and I donated to citizen Mariana Pena two small valleys, very narrow, without varying; and continuing, I donated to citizen Antonio Eleuterio Ortiz, in the same canoncito, a small valley, also without varying, following the same course in the said canoncito, I donated to citizen Jose Francisco Lucero a small valley,

also without varying, and to Jose Antonio Lucero another small valley, the boundary thereof being on the south the mouth of the same canoncito, leaving therefor a plaza one hundred and fifty varas, and fifty of women's gardens and fifty for ingress and egress, there remaining at the mouth of the Canada de la Dorada, for common watering places, one hundred and fifty varas in a direct line, which donation I made in the name of the national sovereignty, in conformity with the law on the subject, the grantees mentioned in the annexed list understanding that the pastures, forests, waters and watering places are in common, and they were further informed that he who fails to occupy and cultivate the land granted within the term of five years, in order to acquire title, the same cannot be by him sold, exchanged or alienated, nor will he be admitted in a new settlement; and if any should of their own accord abandon the tract, they remain informed further that they possess no right, such being the requirements of law; and being informed of and agreeing to all this, they received and accepted possession in virtue of which they plucked up herbs, leaped, cast stones and shouted with joy, saying, God be praised, long live the ration, long live the sovereign congress and the law that governs and protects us, and other manifestations of pleasure, by virtue of which they took possession; and, that it may so appear at all times, I, under this decree, signed this grant and donation with all the authority His Excellency was pleased to confer upon me for the purpose set forth in the above petition and expressed in said decree attached to the present grant, the witnesses being the citizens Jesus Maria Barela and Jose Maria Barela and Jose Francis Lucero, as properly made.

JOSE ANTONIO MARTINEZ.

JESUS MARIA BARELA.

"There was given to Juan de Jesus Jaquez from the boundary of Jose Gabriel Vigil to a pinabete on the north; Valid. (Rubric)." At the close of this follows the list referred to in the report.

Dealing with this matter the court says: "What was the scope and effect of this grant? Obviously, we think,

to give to each individual named in the list the particular tract set apart to him. It was a grant in severalty and not one of a single large tract to several persons to be by them held in common or distributed among each other. It matters not that the petition for this grant was in the name of only two or three individuals, for it was not an uncommon thing for one or more to appear as the representatives of a body or a number of persons. The language of the order of the governor seems to contemplate a grant in severalty, for it speaks of 'the general donation, in which shall necessarily be stated the boundaries of said possession.' The outer limits within which the grants are to be made are to be stated, and within those limits the several grantees are to have possession. Again, the provisions that 'the Alcalde shall take charge of the general document of distribution' and 'give testimonios therefrom as may be requested,' carries the same suggestion. The alcalde is to take charge of this general document for filing in the archives, but while holding it he is to give testimonios from it to the several parties who receive grants within the outboundary limits. But whatever doubts might arise from an examination of the governor's order, if that was the only document to be considered, the report of the alcalde's proceedings shows affirmatively that he distributed the lands in the presence of the parties interested, 'giving to each one one hundred and fifty varas in a direct line.' He evidently understood that he was to distribute this land among certain individuals. He proceeded to do so and gave juridical possession accordingly. Whatever may be thought of his interpretation of the governor's order, the only juridical possession which is shown to have been given is juridical possession in severalty to the parties named in the list. The original petitioners were never put, so far as the record shows, in juridical possession of the entire tract, and such a grant, if it was so intended, was never made effective by any juridical possession. We think it more in consonance with justice and equity to hold, not that the grant was of an entire tract which never became operative because of a failure to give juridical possession, but the alcaldes rightfully understood it as

a grant in severalty, and giving juridical possession vested in the grantees the tracts of which they were so placed in possession. United States v. Santa Fe, 165 U. S. 675; United States v. Sandoval, 167 U. S. 278; Rio Arriba Land & Cattle Co. v. United States, 167 U. S. 298." Still another case came before the court of private land claims involving this question, that being the Fernandes de Taos grant, which was tried before that court under the title of Juan Santistevan v. United States. The material title papers there involved were as follows: "On the first day of May, of the present year, one thousand seven hundred and ninety-six, I, the Alcalde Mayor and War Captain of the Pueblo of Taos and its districts, Don Antonio Josef Ortiz, in obedience to that which was ordered by Lieutenant Colonel Don Fernando Chacon, Knight of the order of Santiago and Civil and Military Governor of this Kingdom, I, the said Alcalde Mayor, before going to the place of the said tract of the Rio de San Fernando, in company with two witnesses who were Don Antonio Josef Lovato and Don Lorenzo Lovato, there being present the sixty three families, I explained to them the petition which they had made and I informed them that to obtain such possession they must keep and observe the following conditions in due form of law: That the said place must be common not only to them but to all who may hereafter join the settlement, and that in view of the exposed situation of the place they shall be provided with fire arms or bows and arrows which arms shall be inspected at the time of their entrance as well as at any other time that the alcalde may direct, with the understanding that within two years after taking possession all the arms which they have shall be fire arms under the penalty that those who do not provide themselves shall be dismissed from the said settlement; that the town which they build shall be like that which they describe in their petition; and they all together and each one for himself having heard the said conditions they replied unanimously that they knew and understood that which had been explained to them, and I therefore took them by the hand and I said in a clear and intelligible voice that in the name of His Majesty (whom may God

preserve) and without prejudice to his royal estate nor to that of any third party I walked with them over the said lands and they pulled up grass and threw stones and shouted, saying 'Long live the king,' taking possession of the said lands quietly and peaceably without any opposition, their boundaries being designated for them, and they are: On the west, lands of Don Antonio Josef Lovato, below in the bottom, and above, the middle road; on the east, the canon of the Rio de San Fernando; on the south, the Ceja, which is on the other side of the river, and on the north, the boundary line of the Indians of Taos, with the notification that the pastures and watering places are common, and in order that it may so appear I signed it as Receptoria in the absence of a notary, of which there is none, with my assisting witnesses, with whom I act, to which I certify. ANT. JOSEPH ORTIZ."

"Pueblo of San Geronimo de Taos, November 7, 1797.

"The settlers of the Rio de San Fernando, having petitioned the Lieutenant Colonel, the Governor of this Kingdom, Don Fernando Chacon, that he would be pleased to grant them, in the name of his Majesty (whom may God preserve) the surplus of the waters of the Taos river and that of the Lucero and His Excellency having given the order to me, the said Alcalde Mayor, in order that I should do so in the name of His Majesty, I give them the present for their better protection. To which I certify.

"ANT. JOSEF ORTIZ.

"In the City of Santa Fe, of New Mexico, on the ninth day of the month of August, one thousand seven hundred and ninety-nine, I, Don Fernando Chacon, Civil and Military Governor of the said Province, granted the possession of lands which in the name of His Majesty was given to the settlers located at the place of San Fernando for them, their children and successors, without power ever to alienate or sell and permitting them as poor persons, to include within two sheets of stamped paper the particular possession given to each settler with the amount belonging to him, and I signed it with my Secretary in the absence

of a notary, royal or public, of which there is none in this province.    FERNANDO CHACON.

JOSEF PASCUAL GARCIA.

Following the foregoing document was one giving a list of settlers with the number of varas allotted to each.

The Court of Private Land Claims, viewing these title papers in the light of the three cases above cited, held that the title conveyed by the government covered only the several allotments and did not include unallotted or non-agricultural land, these being reserved for the crown, either for future allotment or as royal estate.

It only remains to determine whether the title papers in the present case first above quoted, came within the rule shown to be applicable to the cases last mentioned. It is with the view that this might be clearly developed that the title papers in the other cases have been quoted at such length. We are of the opinion that the Tome title papers reasonably partake of the same nature as those involved in the several cases dealt with by the Court of Private Land Claims. The petition was in order to found a settlement. The grant as made by Governor Mendoza was to the partitioners, but not to them only. It ran in favor of "whoever may have a right thereto under the conditions and circumstances required in such cases," and it distinctly provides that it is to be "without prohibition to any one desiring to settle the same." The Governor expressly provides for allotments by ordering that there shall be given to each one "the portion he may be entitled to in order to avoid difficulties which may occur in the future." The act of juridical possession shows that among those who appeared for the purpose of being given allotments were a number not named in the original petition and that, indeed, a number of the original petitioners did not appear. This demonstrates that in the minds of the parties present for juridical possession the grant was not deemed to be confined to the original petitioners, but was with a view to a settlement in which all who were willing to join in the common enterprise were entitled to receive allotments. This condition brings the case, in our judgment, clearly within the rule stated in the cases above

Roswell v. Railway Co., 16 N. M. 685.

mentioned. In other words, the only title which passed from the crown was to the allotments and these to each of the allottees respectively, and not to the community to be held in common as the property of all. The outlying land remained in the crown subject, however, to use for pasturage and other purposes by the members of the community. That this last, however, constituted a title in no sense, but simply a permissive use at the pleasure of the crown, is pointed out in the Sandoval, Rio Arriba Company and Pena cases above referred to. The similarity between the present title papers and those in the Pena case impresses us as particularly noticeable. This being the nature of the Tome title papers we hold, with the contention of the appellees, that when Congress came to act upon this claim in 1858, it passed as the property of the United States to the town of Tome all of the land not previously allotted to settlers. This thus partook of the nature of an original grant to that town and to its successors, the present defendant corporation. The grant was burdened with no trust in favor of plaintiffs as the successor in title to certain of the original allottees, and the court below was therefore right in declining to impress upon the confirmation any such declaration of a trust. The judgment is affirmed.

SYLLABUS (BY THE COURT).

